# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BCIM STRATEGIC VALUE MASTER FUND, LP, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | C.A. No. 2019-0558-JTL |
| HFF, Inc., | ) ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 18, 2022
Date Decided: February 2, 2022

David J. Margules, Elizabeth A. Sloan, Jessica C. Watt, BALLARD SPAHR LLP, Wilmington, Delaware; Stephen Brauerman, Emily A. Letcher, BAYARD PA, Wilmington, Delaware; William B. Igoe, Philadelphia, Pennsylvania, *Attorneys for Petitioner*.

William M. Lafferty, Ryan D. Stottmann, Sarah P. Kaboly, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington Delaware; Marc J. Sonnenfeld, Laura H. McNally, MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, Pennsylvania; *Attorneys for Respondent*.

**LASTER, V.C.**

The petitioner owned shares of Class A common stock in HFF, Inc. ("HFF" or the "Company"). On July 1, 2019, Jones Lang LaSalle ("JLL") acquired the Company through a reverse triangular merger (the "Merger"). Under the agreement and plan of merger that governed the transaction (the "Merger Agreement" or "MA"), each share of Company common stock was converted into the right to receive $24.63 in cash and 0.1505 shares of JLL common stock.

When the parties reached an agreement on price on February 17, 2019, the exchange ratio implied a value for the stock component of $24.83 per share, resulting in aggregate deal consideration of $49.46 per share. By March 19, 2019, when the parties announced the executed Merger Agreement, JLL's stock price had declined, resulting in aggregate deal consideration of $49.16 per share. By the date of closing, JLL's stock price had declined further, resulting in aggregate deal consideration of $45.87 per share. At that point, the implied value of the consideration was 1.38% below the closing price of the Company's stock on the day before the announcement of the Merger.

The petitioner pursued its statutory right to an appraisal under Section 262 of the Delaware General Corporation Law. At trial, the petitioner proffered two valuation methodologies to establish the Company's fair value. One was a traditional discounted cash flow ("DCF") methodology, which provided a valuation indication on the closing date of $56.19 per share. The second approach started with the Company's unaffected trading price before the announcement of the Merger, then adjusted the price based on a model designed to reflect changes attributable to the Company's unexpectedly good financial performance

after the announcement of the Merger. The adjusted trading price methodology provided a valuation indication of $58.68 per share. The petitioner argued for placing 90% weight on the DCF methodology and 10% weight on the adjusted trading price, resulting in a fair value determination of $56.44 per share.

JLL[1] argued against the petitioner's methodologies and in favor of using the deal price at the time of signing, adjusted to reflect the amount of net synergies allocated to the Company. Based on this methodology, JLL contended that the fair value award should not exceed $44.29 per share.

The Delaware Supreme Court's recent appraisal jurisprudence treats the adjusted deal price methodology as first among equals, so long as the transaction process exhibits sufficient objective indicia of reliability. This decision employs that methodology and agrees with JLL that it generates a reliable indication that the fair value of the Company at the time of signing was not more than $44.29 per share. In an appraisal, however, the court must determine the fair value of the Company at the time of closing, and the record evidence supports a finding that the value of the Company increased by the time of closing. Quantifying the magnitude of that change is an admittedly difficult task. Based on changes to the implied market price methodology advocated by JLL's expert, this decision finds

---

[1] Technically, an appraisal proceeding pits the petitioners who have opted for appraisal against the corporation that survived the merger. After an acquisition, however, the buyer is the real party in interest on the respondent's side of the case. *See In re Appraisal of Regal Ent. Gp.*, 2021 WL 1916364, at *1 n.1 (Del. Ch. May 13, 2021); *In re Appraisal of Columbia Pipeline Gp., Inc.*, 2019 WL 3778370, at *17 (Del. Ch. Aug. 12, 2019). Reflecting this reality, this decision refers to the respondent's arguments as JLL's.

that the value of the Company increased between signing and closing by $2.30 per share. Accordingly, this decision determines that the fair value of the petitioner's shares, at closing, was $46.59 per share. That amount is less than the value of the consideration that the parties negotiated at signing, but more than the value of the consideration that the petitioner would have received at closing.

## I.     FACTUAL BACKGROUND

Trial took place over four days. The parties introduced 1,547 exhibits, including nineteen deposition transcripts. Six fact witnesses and four experts testified live.[2]

This decision weighs the evidence, including issues of witness credibility, and makes factual findings. The witness testimony often conflicted with the contemporaneous record. In resolving factual disputes, this decision generally has given greater weight to the contemporaneous documents. The following factual findings represent the court's determinations based on a preponderance of the evidence.

### A.     The Company

The Company was a Delaware corporation headquartered in Dallas, Texas. The Company described itself as a commercial real estate financial intermediary that provided

---

[2] In the pre-trial order, the parties agreed to 190 stipulations of fact, and the court has relied on those stipulations when pertinent. Citations in the form "PTO ¶ —" refer to stipulated facts in the pre-trial order. Dkt. 119. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX —— at —" refer to a trial exhibit with the page designated by the last three digits of the control or JX number or, if the document lacked a control or JX number, by the internal page number. If a trial exhibit used paragraph numbers, then references are by paragraph.

capital markets services to the real estate industry by matching consumers of real estate capital with sources of real estate capital. In simplified terms, the Company was an investment bank that focused on real estate deals. The Company's monoline business contrasted with competing real estate firms that provided diversified products and services.

At the time of the Merger, the Company had offices in twenty-five U.S. cities and in London. It was a market leader for debt placement, investment advisory, equity placement, fund formation, marketing, M&A and corporate advisory, and loan sales and loan servicing platforms. In 2018, the Company generated $662 million in total revenue, making it one of the largest real estate financial intermediaries in the United States. Over 90% of its revenue came from service fees earned from real estate lending transactions. The bulk of the remaining revenue came from portfolio management fees.

The Company's business was driven by its employees, particularly the sales professionals who are known in the industry as "producers." The Company compensated its producers with a unique structure that combined aspects of a commission-based model with additional opportunities for profit participation. Given its business model, the overwhelming majority of the Company's expenses were employee-related. In 2018, 82% of its operating expenses came from compensation and other employee-related costs.

## B. JLL Approaches The Company.

JLL first reached out to the Company about a potential business combination in December 2017. John Gates, the CEO of JLL's Americas Markets business, contacted Mark Gibson, the Company's CEO, to have "an informal discussion" about potential

business opportunities. Gibson Tr. 8. Both men worked in Dallas, and they were friendly. Over coffee, they agreed that a merger could be attractive for both companies.

Seven months later, JLL made a stronger approach. On July 24, 2018, Christian Ulbrich, the President and Global CEO of JLL, called Gibson to explore a potential transaction. In addition to serving as President and Global CEO, Ulbrich also was a member of JLL's board of directors (the "JLL Board") and the Chairman of the JLL Global Executive Board.

At the time of the events giving rise to this proceeding, JLL was a Fortune 500 company with annual revenue of $18 billion, operations in over 80 countries, and a global workforce of 93,000. JLL's shares of common stock traded on the New York Stock Exchange under the symbol "JLL."

JLL was a full-service, international professional services firm that specialized in real estate and investment management. It offered a full suite of real estate products, including capital markets services. JLL saw an acquisition of the Company as a way to increase the strength of its U.S. capital markets business.

In response to Ulbrich's outreach, Gibson made clear that governance issues would be a priority. He stressed that "[c]ulture is really important" and that the Company regularly rebuffed potential acquirers who contemplated altering the Company's governance and compensation structures. JX 1409 at 1.

Ulbrich was receptive. He proposed running the combined company "as a partnership" with Gibson and his senior leadership heading up the global capital markets

5

business. Ulbrich Tr. 589, 591–92; JX 1409 at 1. He also agreed that retaining the Company's producers would be critical. Ulbrich Tr. 591–92.

After the call, Gibson conferred with Joe Thornton, the Company's President. Together, they briefed the other members of the Executive Committee, a group consisting of the Company's senior officers that had responsibility for running the Company's day-to-day business. In addition to Gibson and Thornton, its members were Greg Conley, the Company's Chief Financial Officer; Nancy Goodson, the Company's Chief Operating Officer; and five of the Company's Executive Managing Directors. The consensus view was that a transaction with JLL sounded promising.

On August 21, 2018, Gibson and Thornton met with Ulbrich, Gates, and Richard Bloxam, JLL's Global CEO of Capital Markets, at an industry event in New York. Gibson explained that the Company regularly declined to engage with would-be acquirers unless there was a likely fit. He reported that in JLL's case, the Executive Committee believed there was "an excellent cultural fit." JX 191 at '001.

After the meeting, Gibson informed the Company's board of directors ("the Board") about the discussions with JLL. Then, Gibson emailed Ulbrich, telling him that the Company "would have to be assured its management team would lead the global capital markets business for JLL." *Id.* He also reiterated the importance of retaining the Company's producers, which would require that the combined entity adopt the Company's compensation model. *Id.* at '002.

Gibson proposed that "the next step . . . should consist of an office by office review of personnel, a review of a governance structure and an overview of JLL and HFF's

6

compensation structure." *Id.* at '001. He cautioned that several of JLL's producers were former Company producers "who were either asked to leave or demoted for either cultural incapability or lack of productivity." *Id.* at '002. He also warned that there were other JLL producers "who would not be a cultural fit and do not have the necessary market share or productivity to remain" at the combined entity. *Id.*; *see* Ulbrich Tr. 597–98.

Notably, all of these discussions took place before anyone mentioned a potential transaction price. And Gibson was proposing to have the office-by-office review before anyone discussed a potential transaction price. For JLL, that approach was attractive, because JLL could obtain buy-in for the deal from the Company's executives and producers before engaging on price.

**C.**      **More Detailed Discussions About Structure And Compensation, But Not Price**

On September 7, 2018, Gibson and Ulbrich agreed to proceed as Gibson had suggested. With discussions moving forward, neither side wanted a leak that might prompt competitors to make runs at producers. JLL was particularly sensitive to this risk, as leaks had undermined several of JLL's past M&A efforts.

The Company and JLL therefore entered into a confidentiality agreement dated September 27, 2018. The agreement included a standstill provision that prohibited either company from making an unsolicited acquisition attempt for a period of twelve months.

The next significant interaction took place on October 8, 2018, when Gibson and Ulbrich met again. Gibson repeated his strong views about governance and compensation. He also proposed that the combined company organize its capital markets business by line rather than by geography. Under the line system, which the Company used, the business

7

units within a particular line of business reported to successively more senior executives in that line of business. Under the geographic system, which JLL used, the leaders of business units in a particular geographic area reported to successively more senior executives who oversaw larger geographic areas. Using a line-based organization would mean that the combined company would adopt the Company's reporting structure.

After the meeting, representatives of JLL and the Company exchanged organizational charts. By this point, Gibson and the other members of the Executive Committee were confident that they could achieve their goal of controlling the combined entity's capital markets business. *See* JX 267 at 1–2.

Four months had now passed since Ulbrich had called Gibson to explore a potential transaction. Still no one had engaged on price. When the topic came up on October 25, 2018, during a call between Gibson and Greg O'Brien, the CEO of JLL's Americas division, Gibson indicated that he did not think the price would be an issue and that his management team was "ready to run at this hard." JX 273 at 2. O'Brien reported to his side that Gibson "wants this to happen" and valued "more structure than price." JX 271.

**D.      JLL Floats A Price.**

On November 7, 2018, during a meeting in New York, Ulbrich told Gibson that JLL valued the Company preliminarily at between $45 and $46 per share. At the time, the Company's stock was trading around $38 per share, so the range reflected a premium of 12–14%. Ulbrich proposed mixed consideration consisting of 50% cash and 50% stock.

Gibson declined to engage on price, stating that "neither party had sufficient information to determine appropriate valuations at that point in time and further work on

8

governance . . . should occur before further discussions on price." JX 1258 at '118; *accord* Gibson Tr. 40–41. Gibson thus expressly prioritized governance over price.

After the November 7 meeting with Ulbrich, Gibson provided the Board with an update, and the Board decided it was time to hire a financial advisor. On November 13, Gibson and two of the outside directors met with Morgan Stanley & Co. LLC. Gibson had known Guy Metcalfe, Morgan Stanley's Global Chairman of Real Estate, since 2007, and the Company had used Metcalfe on other transactions. On November 14, the Board authorized management to hire Morgan Stanley and continue discussions with JLL. The Company did not interview other potential financial advisors. Gibson Tr. 54.

Over the next two weeks, Gibson, Thornton, and other members of the Executive Committee held multiple phone calls with JLL's management team to discuss the structure and makeup of the combined company's U.S. capital markets business. On November 21, 2018, Gibson described the results of those discussions in an email to the Expanded Executive Committee, a broader group that included the members of the Executive Committee plus another nine individuals comprising the next layer of management.

Gibson explained that the discussions had focused on governance, compensation, and cultural fit. He boasted that "at present we are at about 90% of every single thing we have requested which in and of itself is unusual in these types of situations." JX 368 at 1. He noted that he had obtained significant concessions from JLL on the staffing and leadership of various offices, including the ouster of producers and other personnel at JLL whom Gibson regarded as "cultural misfit[s]." *Id.* at 2. His email did not contain any information about the pricing of a potential transaction.

9

**E.      The November 29 Meetings**

On November 29, 2018, the Board convened so that Morgan Stanley could provide a preliminary assessment of the value of the Company and offer guidance on a sale process. Morgan Stanley's valuation analyses produced a range of values between $34.11 and $52.82 per share for the Company. JX 382 at 16. Morgan Stanley had not received any projections from management; it relied on a set of projections in an analyst report prepared by Keefe, Bruyette & Woods, Inc. ("KBW"), another investment bank. Morgan Stanley's presentation noted that "[s]ubsequent work if appropriate could employ internal projections." *Id.* at 10.

Morgan Stanley's presentation also discussed other potential acquirers. The list included Colliers International, Jefferson, CBRE, Cushman & Wakefield, Savills, and Newmark Knight Frank. Morgan Stanley estimated that the other bidders could pay between $28.07 and $58.55 per share for the Company. *Id.* at 29.

During the meeting, Company management stressed that JLL had "largely agreed to retain our governance structure," with the pro forma organizational charts showing Company employees comprising "89% of the total leadership headcount." JX 387 at '960; *see id.* at '963. Company management also noted that the Company's "significant leaders will likely have to sign employment agreements" with JLL, which would "require compensation." *Id.* at '961.

During the meeting, the Board discussed forming an independent committee to negotiate with JLL. The directors decided against it. They thought Gibson and Thornton were appropriate negotiators because they would not receive any special compensation

10

from the transaction and "were major shareholders of the company." McAneny Tr. 446. As a result, Gibson continued to lead the negotiations.

Later on November 29, 2018, Gibson met with Ulbrich and Bloxam in London. Ulbrich again stated that JLL was prepared to pay between $45 and $46 per share for the Company. Gibson said that the Company would consider the proposal, but that he would need a price of "$50 or higher." JX 384. Ulbrich responded that JLL's stock was undervalued such that JLL's offer was the equivalent of $62 per share. Gibson demurred. They agreed to "call our bankers and have them work on a model that we could both work from." *Id.* By this point, the JLL Board had already given Ulbrich "full authority . . . to execute" a transaction. *Id.* JLL's internal analyses showed a transaction could be accretive for JLL at prices as high as $50 per share. JX 329 at '010; *see id.* at '012.

After the meeting, Gibson spoke with his colleagues about having Morgan Stanley prepare a "financial model that we can use to truly value HFF and show [JLL] why we believe x is the right price." JX 391; Gibson Tr. 58. He wanted Morgan Stanley to "analyze JLL's financial information in great detail" to determine the value of the combined company. Gibson Tr. 57. Despite six months of discussions, Gibson did not think his side had enough data about JLL to price the deal. JX 400.

By this point, the Company already could have obtained the information that Gibson wanted. The issue was only coming up in December because Gibson had prioritized negotiations about governance, employees, and compensation.

**F.      The Parties Exchange Term Sheets.**

JLL had hired J.P. Morgan as its financial advisor. On December 8, 2018, J.P. Morgan sent a term sheet to Morgan Stanley that proposed consideration per share of $22.50 in cash plus 0.156 shares of JLL stock. The stock consideration was designed to equate to $22.50 per share. JLL thus proposed a price of $45 per share, the lower end of the range of $45 to $46 per share that Ulbrich had twice mentioned.

Morgan Stanley did not send the term sheet to the Company. Internally, Metcalfe asked how the price was "so far off" what management expected, describing it as "a major buzz kill if not more." JX 423 at '004. A colleague noted that the bankers had not yet agreed on a model and did not have a shared view on synergies. *Id.* at '003–04. Morgan Stanley viewed other proposed terms as favoring JLL, including a 4% termination fee for JLL with no mirror-image termination fee for the Company and a one-way exclusivity commitment that bound the Company but not JLL. *Id.* at '002.

Morgan Stanley asked J.P. Morgan to resubmit the term sheet without the price term, and J.P. Morgan accommodated that request. The revised term sheet proposed only a mixed cash and stock deal with JLL's stock valued at its ninety-day volume-weighted average price ("VWAP"). JX 430 at '003–04. J.P. Morgan also backed off the other one-sided terms. The revised term sheet contemplated "customary non-solicitation terms" subject to a "fiduciary out" and a 4% termination fee if either side breached the agreement or terminated it to accept a superior proposal. *Id.* at '006–08.

The term sheet contemplated the execution of "[e]mployment and retention agreement(s)" for "a mutually agreed to list of [Company] employees." *Id.* at '003. It also

required that members of the Board, senior Company management, and "significant insider stockholders" execute voting agreements in favor of the transaction. *Id.*

On December 13, 2018, the Company countered with its own term sheet. JX 442. It shortened the period for valuing JLL's stock from a ninety-day VWAP to a thirty-day VWAP. The Company also added a go-shop provision that would permit the Company to solicit competing bids during the forty days after execution of the merger agreement. If the Company terminated the agreement to accept a superior proposal during the go-shop period, then the Company would pay a termination fee equal to 1.25% of the transaction price. If the Company terminated the agreement after the go-shop period, then the Company would pay a termination fee equal to 2.5% of the transaction price.

The Company's term sheet specified that Gibson and Bloxam would serve as co-chairs of JLL's Global Capital Markets Board. It also specified personnel for the senior leadership team of the combined company and the leadership team for JLL's U.S. Capital Markets organization. The term sheet provided that the combined company would retain the Company's existing governance structure. The membership of the Executive Committee and the Expanded Executive Committee would remain unchanged, except that two JLL executives would be added.

On December 14, 2018, the Company made an electronic data room available to JLL. It contained documents about the Company's corporate structure, financial performance, operations, and employee compensation.

Meanwhile, JLL resisted providing detailed financial information to the Company. Neither HFF nor JLL provided guidance to Wall Street, and JLL took the position that it

13

would not share forward-looking information because of that policy. For example, JLL's lawyers argued that any forecast that JLL provided would need to appear in the proxy statement, which they thought was undesirable. JX 457 at '002. The Company's lawyers suggested that Morgan Stanley could "'work around this issue' via other means." *Id.* The lawyers' fix was for Morgan Stanley to "review analyst reports as to consensus views on [JLL's] forward earnings / valuation," then to "[g]et guidance from [JLL's] management team" as to how to modify the analyst information and assumptions for Morgan Stanley's model. *Id.* The lawyers thus wanted JLL to share forward-looking information in substance, but in a way that would not create a paper trail.

JLL's executives overruled the lawyers. The executives anticipated that if Morgan Stanley started from analyst estimates and did not have access to JLL's internal projections, then Morgan Stanley and the Company would place a lower value on JLL's stock and demand a higher exchange ratio. Ulbrich decided that JLL would share its forecasted earnings per share for 2018 and 2019. *Id.* at '001.

## G.    The Retention Payments

On January 9, 2019, the Company sent Morgan Stanley a list of proposed retention payments for its key producers. The Company wanted JLL to pay a total of $111.5 million in retention payments to fifty-one producers. Of this amount, $96 million would go to a top tier of twenty-nine producers, and another $15.5 million would go to a second tier of twenty-two producers. The payments would take the form of 50% cash and 50% stock, with the stock "freely transferable at time of vesting." JX 500 at '002. None of the producers needed to remain employed for the stock consideration to vest.

14

Morgan Stanley thought the ask was too rich. Metcalfe stated, "This comes across as 100% payout. Nothing here re fixed vs. variable. Comes across as not retention/performance incentives, but a payoff." JX 501 at '002.

Metcalfe suggested restructuring the retention arrangements so that 50% of the payments would be fixed, 25% of the payments would depend on "reasonable performance goals," and the remaining 25% would be based on the discretion on the combined company's leadership. Metcalfe's colleagues agreed with him. *Id.*; JX 503 at '001.

After a discussion between Goodson and Metcalfe, Morgan Stanley sent JLL a moderately revised proposal. The revised terms required that a producer remain employed for her stock-based payment to vest. JX 500 at '002. Otherwise, the terms remained the same. Metcalfe wrote to a colleague that he thought "the optics could be viewed as off-putting" because the retention payments looked like a payout rather than a retention package. JX 503 at '001. He added that "if we were selling the business and not managing it, our ask is fine. But we're selling it and supposed to be leading it and the ask seems rich in that regard." *Id.*

Over the next three weeks, the Company and JLL had extensive discussions about the retention agreements. During the same period, Gibson continued ***not*** to negotiate with JLL over the deal price. The management team's areas of focus suggested that the deal was effectively done at the price range JLL had specified. To counteract that impression, the Board instructed Morgan Stanley to tell J.P. Morgan that the parties did not yet have a deal and that any future proposal would have to provide a total value of $47 or more. That price would be net of transaction expenses and incentive arrangements. PTO ¶¶ 114-15.

15

On January 19, 2019, Gibson met with two senior JLL executives—Gates and Jay Koster, the Group Head of Capital Markets and Investor Services for JLL's Americas business—to discuss aspects of the transaction. One issue was who would bear the cost of the retention payments. Gibson and Thornton thought JLL should bear the cost. Gates and Koster responded that the deal price should be reduced to account for the retention agreements. Koster Tr. 484–86. They chose not to debate the point further.[3]

## H.    The Parties Reach Agreement On Price.

In a flurry of discussions between February 7 and February 17, 2019, the parties reached agreement on price. J.P. Morgan kicked off the discussions by providing an updated term sheet on February 7 that specified deal consideration or $46 per share, comprising $23 in cash plus 0.159 shares of JLL common stock. The term sheet removed the go-shop, added a force-the-vote provision, and lowered the termination fee to 3.75% of the transaction consideration. JX 674.

The next day, J.P. Morgan provided "a file with [an] overview of synergies." JX 683. The file contained a single page that contained an estimate of $60 million in synergies.

---

[3] JX 554 at 3; *accord* Koster Tr. 484–85. The proxy statement asserts inaccurately that by January 9, 2019, "it was the understanding of HFF's senior management and HFF's advisors that the actual per share price paid to HFF stockholders would be reduced by the amount of transaction expenses (including retention payments) to be paid in any transaction." JX 1258 at '123. The record evidence demonstrates that there was no agreement by that point and that Company management wanted JLL to pay a price that excluded the value of the retention payments, such that JLL would bear the cost. Koster Tr. 484–86; *see* JX 552 at 1. At the same time, the record reflects that JLL ultimately paid a net price that included the value of the retention payments, so that the Company's stockholders bore the cost.

It did not provide any backup data or explanatory details. On February 9, 2019, J.P. Morgan

shared its merger model. *See* JX 690 at '003.

> Morgan Stanley was nonplussed. Metcalfe responded:
>
> Is this (and yesterday's) email all you are providing us??? Not particularly helpful. We had discussed getting your transaction valuation creation analysis (#3 principally and #2 on your list yesterday), the output of which seemed to be an anchor on your valuation. We really need to understand your perspective and math on the foregoing as a matter of deal merit and deal math. It's quite unusual for there to not be a more open book on this.

*Id.* at '002; *see* JX 1310 at '025 (Metcalfe informing the Board about "Morgan Stanley's

view that additional information should be sought from JLL to understand the basis of

JLL's proposal and expected synergies.").[4] J.P. Morgan contended that what it sent

comprised "the entire framework for the multiples based value creation," missing only

JLL's perspective on 2019 EBITDA. JX 690 at '001. J.P. Morgan suggested that the

Company use Wall Street analyst reports to analyze the synergies. *See* JX 686 at '002.

---

[4] At trial, Metcalfe tried to downplay the import of his email to J.P. Morgan, calling it "a little bit of acting." Metcalfe Tr. 285. He claimed the primary intended audience was his team at Morgan Stanley, whom he was "coaching and teaching about how I want to negotiate or how I want to interact with the other side on matters that . . . could impact valuation." *Id.* at 284. That explanation was not credible, and Metcalfe undermined it in later testimony. Elaborating, he stated that "in a negotiation, there are two ways to get somebody to pay a higher price than they want to pay: One is just to say, no, that's not high enough . . . ; and the other is to see if you can identify conservativeness or holes in their logic or be able to convince them that the glass is half full, not half empty. And so I usually take both of those [tacks]. But I can only take the second [tack] if I can get more information from the other side around what numbers they are using to see if I can identify . . . perhaps some vulnerabilities that I can use from a negotiating standpoint." *Id.* at 285–86. In his email to J.P. Morgan, Metcalfe was pursuing the second strategy. He lacked information that he needed to negotiate, and he was trying to get it.

17

The documents that JLL gave the Company were not the entire framework for JLL's analysis. They also did not reveal all of the synergies JLL had identified. For example, the page omitted an additional $14 million in synergies that JLL identified in its internal estimates. Koster Tr. 519–20. That said, JLL had no obligation to provide the Company with more information. It was entitled to draw a line in the sand.

Morgan Stanley knew that without reliable information about synergies, it would be difficult for the Company to extract a share of their value. Morgan Stanley therefore tried to replicate J.P. Morgan's analysis.

As part of its effort to recreate JLL's synergy calculations, Morgan Stanley asked the Company's management team for any information about their synergy discussions with JLL. Management responded that there had been discussions, but they had involved JLL asking questions and the Company providing answers. The Company had not had conversations in which JLL had provided information. Goodson stated that neither she nor Conley felt "qualified to provide any synergy numbers, because we have no idea what's on the other side." JX 703 at 1.

After this exchange, Morgan Stanley accepted the reality that "we weren't getting detail on their expense structure." Metcalfe Tr. 356. Morgan Stanley therefore accepted the one-page estimate that JLL provided. *Id.* at 281–83. To assess merger synergies, Morgan Stanley used that page and a single analyst report by Raymond James. *See* JX 1063 at 22.

On February 11, 2019, the Board met to discuss the latest term sheet. Morgan Stanley advised that JLL could "increase its offer to $48 per share while still reaping the benefits of certain synergies and advantages from a transaction." JX 1310 at '027. The

18

Board authorized Morgan Stanley to ask for a price of $48 per share, but instructed them to wait until after JLL released its earnings. McAneny Tr. 426–27; JX 1310 at '027.

On February 12, 2019, JLL reported its results for the fourth quarter of 2018 and the full year. After the announcement, JLL's share price increased from $146.27 to $166.15. Because of the increase in JLL's trading price, JLL's earlier offer of $23 in cash plus 0.159 shares of JLL common stock now had a value in excess of $49 per share. Rather than asking for a package of consideration worth $49 per share, the Board authorized Morgan Stanley to make a counteroffer that kept the stock component at 0.159 shares and increased the cash component to $24 per share. At JLL's trading price, that option carried a value of $50.42 per share.

On February 13, 2019, Morgan Stanley presented the Company's counteroffer to J.P. Morgan. J.P. Morgan responded that JLL would not accept the offer, but would consider keeping the stock component at 0.159 shares and increasing the cash component to $23.25 per share.

Later on February 13, 2019, Morgan Stanley countered up with two options. The first option was identical to Morgan Stanley's previous offer, which kept the stock component at 0.159 shares and increased the cash component to $24 per share. By then, JLL's stock price had declined to $163.62 per share. As a result, the first option carried a value of $50.02 per share. The other option was to reduce the stock component to 0.1513 shares and increase the cash component to $24.76 per share. That option carried a value of $49.52 per share.

On February 15, 2019, the JLL Board authorized Ulbrich and JLL's management to make any of three alternative offers. The first kept the stock component at 0.159 shares and increased the cash component to $23.33. At JLL's trading price, that option carried a value of $49.35 per share. The second was to reduce the stock component to 0.1498 shares and increase the cash component to $24.51 per share. At JLL's trading price, that option carried a value of $49.02 per share. The third option was to reduce the stock component to 0.1505 shares and increase the cash component to $24.63 per share. At JLL's trading price, that option carried a value of $49.25 per share.

JLL's management decided on the second option, which valued the Company at $49.02 per share. J.P. Morgan communicated the offer to Morgan Stanley, who responded that JLL would need to increase its offer by at least $0.50 per share.

On February 16, 2019, Ulbrich called Gibson. He offered aggregate consideration of $49.46 per share, comprising $24.63 in cash and 0.1505 shares of JLL common stock, which by then had increased to $164.96 per share.

Later that day, the Company accepted JLL's offer. Only after accepting the deal did Morgan Stanley ask Gibson how the Company planned to handle a possible decline in the value of JLL's stock price. Morgan Stanley suggested a floating exchange ratio to keep the value of the stock component at $24.63 per share. JX 760 at '001. Gibson said he would leave the matter to Morgan Stanley and asked them to "put forth the mechanism of exactly how it would work." *Id.*

No one from the Company proposed a mechanism for addressing changes in JLL's stock price. The parties instead proceeded with a fixed exchange ratio.

20

## I.     Further Negotiation Over Non-Price Issues

On February 17, 2019, the Company circulated a revised term sheet that accepted JLL's price term of $24.63 in cash plus 0.1505 shares of JLL stock. Rather than pushing for the go-shop, the Company proposed a bifurcated termination fee with a lower fee of $25 million if the Company terminated the deal within the first forty days after signing to accept a superior proposal. After that, the termination fee would be $50 million.

The term sheet retained the governance provisions from the earlier term sheets. The term sheet altered the mix for the retention payments to 25% cash and 75% equity.

On February 19 and 20, 2019, the Board convened for a regular meeting. Conley presented the Company's 2019 budget, which projected revenue growth of 4%, with an "[u]pside" target of 8.4%, net income growth of 2.1% and EBITDA growth of 6.5%. JX 767 at '132, '134. Conley summarized the Company's deal pipeline, estimating that the Company's current pipeline would generate 19.1% more in net revenue than the 2018 pipeline report had indicated. *Id.* at '138.

The Board also discussed the status of the transaction. Morgan Stanley observed that the proposed consideration reflected a premium of 15.2% over the Company's stock price as of the close of trading on February 15. Morgan Stanley did not mention the possibility of a mechanism to protect against a decline in the trading price of JLL's stock. *See* JX 782 at '005 (summary of proposed terms).

On February 21, 2019, the Company announced its financial results for the fourth quarter of 2018 and for the full year, beating analyst estimates and its own projections.

21

Analysts reacted positively, and KBW raised its price target for the Company's stock from $41 to $47 per share.

Also on February 21, 2019, the lawyers revisited the bifurcated termination fee. JLL sought to eliminate it. The Company said it was not up for discussion. Four days later, JLL again sought to eliminate the two-tier structure. This time, the Company agreed, as long as the termination fee was not greater than 2.9% of equity value.

During the same period, the Company populated the data room with highly sensitive information about the Company's top producers. Internally, Metcalfe mused, "I think our client is being very naïve. . . . [Gibson] doesn't seem to understand or believe that providing this information is HIGHLY unusual if not unprecedented." JX 829. JLL provided some additional information about JLL, but nothing comparable to what the Company provided. As late as February 25, 2019, Gibson lamented that JLL "has not provided any responses to our Nov [due diligence] requests." *Id.* at '003. JLL eventually populated a data room with "only 23 files . . . , 7 of which are research reports." JX 834 at '001. A Morgan Stanley banker noted that J.P. Morgan had sent an Excel spreadsheet addressing the status of the Company's due diligence requests, but that most of the items on the list were marked either "not to be provided at this time" or "please refer to public filings." *Id.*

In an updated term sheet dated March 4, 2019, the parties memorialized their agreement on a termination fee equal to 2.9% of the Company's equity value. The March 4 term sheet also clarified that Gibson and Thornton would not receive retention payments, but would sign employment agreements with JLL with a term of four years. The other members of the Executive Committee would receive their retention payments in restricted

22

stock units, subject to four-year ratable vesting. All other recipients of retention awards would receive retention awards that took the form of 25% cash and 75% stock. The cash portion was paid at closing but subject to a claw-back if the employee left during the ensuing three years. The stock portion would vest ratably over the ensuing three years.

## J.     Other Prospective Buyers Contact The Company.

On March 8, 2019, an investment banker working for Colliers International asked an executive at the Company if Gibson would be interested in meeting with Colliers about a potential transaction. Gibson asked the executive to have the investment banker call him directly, then informed Morgan Stanley and the Company's counsel. The banker called Gibson and offered to meet when he was in Dallas. Gibson told the banker to let him know when he was in town. No meeting ever took place. Gibson Tr. 86.

On March 12, 2019, a representative of CBRE Group contacted Gibson. The Company and CBRE had engaged in on-again, off-again conversations about a potential transaction over the preceding two years, and the CBRE representative asked about resuming talks. Gibson stated that he would be happy to schedule a call. CBRE never followed up, and no call ever occurred. *Id.* at 24–25.

Gibson reported the calls from Colliers and CBRE to the Executive Committee, the Company's advisors, and the Board. The advisors recommended informing JLL and saying that if JLL wanted to proceed with its deal, then they needed to sign definitive agreements by March 18, 2019. The Board agreed, and the Company followed that course. No one affirmatively pursued the inbound inquiries from Colliers or CBRE on the Company's behalf. Gibson Tr. 87.

**K.    The Merger Agreement**

With less than a week left before March 18, 2019, the parties focused on finalizing the merger agreement. While those efforts were underway, Morgan Stanley pressed JLL for information about its first quarter performance to support the fairness opinion Morgan Stanley would present to the Board. JLL rebuffed Morgan Stanley, stating that "we do not give guidance nor can we comment on whether we will come in under, in line or ahead of analyst expectations. Q1 tends to be seasonally [the] slowest quarter." JX 1004 at '002.

On March 15, 2019, the Board held a meeting to review the merger agreement. Management reported on the inquiries from Colliers and CBRE, then Morgan Stanley gave a presentation on the status of the deal and discussed the trading prices of the JLL's and the Company's stock. Since the parties had agreed on the deal price on February 16, the Company's stock price had by increased by 7.5%. By contrast, JLL's stock price had decreased by 2%. As a result, JLL's offer now equated to $48.96 per share, reflecting a 7.6% premium over the Company's current stock price.

The Board also discussed whether to renew the Company's previous request for a bifurcated termination fee. The Board authorized Morgan Stanley to ask for the bifurcated fee, and further negotiations ensued. The parties ultimately agreed that if the Company terminated the merger agreement within 45 days of execution, then the termination fee would be $27 million, roughly equal to 1.4% of the Company's equity value in the transaction. After 45 days, the Company termination fee would increase to $54 million termination fee, roughly equal to 2.8% of the Company's equity value in the transaction.

24

On March 18, 2019, the Board met again to discuss the Merger. At the meeting, Morgan Stanley presented its financial analysis and summarized its fairness opinion.

Morgan Stanley presented a DCF analysis, a comparable companies analysis, and a comparable transactions analysis. The DCF analysis relied on the Company's 2019 budget. Morgan Stanley did not incorporate value from the Company's pipeline of deals, which suggested that the Company would perform better than budgeted. Conley Tr. 172–73, 239–40; *see* JX 489. Morgan Stanley's analysis did incorporate KBW's analyst forecast for the Company, which projected negative revenue growth for 2019. JX 1063 at 15. Among the public equity analysts who covered the Company, KBW's projections were the most conservative. *See* JX 827 at '002, '004.

For its analysis of JLL, Morgan Stanley relied on public information and an analyst report from Raymond James. Morgan Stanley's presentation noted that it had "assumed, with the Company's consent, that" the forecasts in its model provided "a reasonable basis upon which to evaluate the business and financial prospects of [JLL]." JX 1258 at '338.

Having failed to obtain meaningful synergy information, Morgan Stanley relied on the summary data Metcalfe previously had characterized as inadequate. Morgan Stanley did not independently verify the synergy estimates. Gibson Tr. 78; McAneny Tr. 466–67.

At the conclusion of the meeting, the Board unanimously approved the Merger Agreement. Every member of the Board and the Company's key employee stockholders executed voting agreements in support of the Merger Agreement. The Company's key producers executed and delivered their retention and employment agreements, and Conley and Goodson executed amended and restated employment agreements.

On March 18, 2019, the parties executed the Merger Agreement. It contained the price term from the March 4 term sheet: Each share of Company common stock would be converted into a right to receive $24.63 in cash and 0.1505 shares of JLL stock.

On the date of the signing of the Merger Agreement, the Company's stock closed at $46.51 per share. JLL's stock closed at $163.02 per share. The Merger Agreement thus contemplated consideration valued at $49.16 per share.

On March 19, 2019, the Company and JLL issued a joint press release announcing the Merger. After the announcement, the Company's stock closed at $49.01, up 5.38% from the previous day's close. JLL's stock fell 1.55% to $160.49.

In response to the announcement, S&P Global Ratings downgraded JLL's outlook to negative, citing its "expectation of leverage rising above 2.0x upon closing of the [Merger] and the potential integration risk related to this large-scale acquisition." JX 1088 at 2. S&P warned that it "could lower the ratings over the next 18-24 months if leverage, measured by net debt to EBITDA, continues to stay above 2.0x with no cogent plan of reducing it" or if JLL "faces material integration risk related to its acquisition." *Id.* at 4.

Reflecting the ratings downgrade, JLL's stock fell an additional 4.31% on the next day, closing at $153.57. The Company's stock declined to $47.77, wiping out roughly half of its gains since the announcement of the Merger.

## L.     The Company Beats Expectations For The First Quarter Of 2019.

On April 24, 2019, the Company announced its results for the first quarter of 2019, which dramatically exceeded analysts' expectations. The Company reported significant year-over-year increases in revenue (20.9%), adjusted EBITDA (80.6%), and net income

26

(62.9%). JX 1178 at '004. Citing the pending Merger, the Company's management did not take questions during its earnings call. *See* JX 1179.

Analysts reacted positively to the Company's earnings release. William Blair published a research report titled, "Much Better-Than-Expected Results Are Good Sign for Broader Industry." JX 1182. Goldman Sachs claimed that the Company's earnings vindicated its thesis that "[m]acro conditions are great" for real estate companies. JX 1183 at '003. Goldman opined that the Company's excellent earnings might "change the underlying assumptions for the proposed acquisition" of the Company by JLL. *Id.* at '001. At the same time, Goldman suggested that "JLL's own US capital markets business in 1Q may be challenged." *Id.*

## M. The Merger Closes.

On May 2, 2019, the window closed for the Company to accept a superior proposal and pay only a $27 million termination fee. After that, the Company would have to pay a termination fee of $54 million.

On May 31, 2019, the Company filed its proxy statement with the United States Securities and Exchange Commission. JX 1258 (the "Proxy"). The Proxy included a summary of the projections that Company management prepared for the 2019 annual budget. By that time, the Company already had exceeded those projections significantly. The Proxy also included Morgan Stanley's fairness opinion.

On July 1, 2019, the Company's stockholders voted to approve the Merger. At the time of the vote, there were 39,823,827 shares of Class A common stock outstanding. Holders of 31,927,751 shares voted in favor, representing 80.2% of the outstanding shares.

27

The Merger closed later that day. During the 104 days since the announcement of the Merger, no competing bidder had emerged.

Under the Merger Agreement, each share of Company common stock was converted into the right to receive $24.63 in cash and 0.1505 shares of JLL common stock. JLL's stock price closed at $141.13 on the date the Merger closed, resulting in transaction consideration of $45.87 per share. The decline in JLL's stock price meant that the value of the consideration delivered at closing was 7.3% lower than the price of $49.46 per share implied by Ulbrich's offer on February 16, 2019. Ironically, the value of the consideration at closing was 1.38% lower than the trading price of the Company's stock on the day before the announcement of the Merger.

During the second quarter of 2019, the Company again outperformed expectations and analysts' forecasts. Conley Tr. 158–60; *see* JX 1380. The Company's revenue grew 12.7% year-over-year, resulting in the Company generating year-over-year revenue growth of 16.5% for the first half of 2019. JX 1388 at '001.

After the closing of the Merger, Gibson became the CEO of JLL Capital Markets, Americas, and Co-Chair of JLL's Global Capital Markets Board. Thornton became the President of JLL Capital Markets, Americas. Conley became the CFO of JLL Capital Markets, Americas. Goodson became the Executive Managing Director and COO of JLL Capital Markets, Americas.

**N.    This Appraisal Proceeding**

On the date of the closing of the Merger, petitioner BCIM Strategic Value Master Fund, LP owned 1,983,000 shares of Company common stock. The petitioner eschewed the consideration offered in the Merger and pursued appraisal.

## II.    LEGAL ANALYSIS

"An appraisal proceeding is a limited legislative remedy intended to provide shareholders dissenting from a merger on grounds of inadequacy of the offering price with a judicial determination of the intrinsic worth (fair value) of their shareholdings." *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1186 (Del. 1988). The appraisal statute states that "the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation." 8 *Del. C.* § 262(h). The statute instructs that "[i]n determining such fair value, the Court shall take into account all relevant factors." *Id.* "The time for determining the value of a dissenter's shares is the date on which the merger closes." *Brigade Leveraged Cap. Structures Fund Ltd. v. Stillwater Mining Co.*, 240 A.3d 3, 17 (Del. 2020).

In its seminal decision on the meaning of fair value, the Delaware Supreme Court provided the following definition:

> The basic concept of value under the appraisal statute is that the stockholder is entitled to be paid for that which has been taken from him, viz., his proportionate interest in a going concern. By value of the stockholder's proportionate interest in the corporate enterprise is meant the true or intrinsic value of his stock which has been taken by the merger. In determining what figure represents this true or intrinsic value, . . . the courts must take into consideration all factors and elements which reasonably might enter into the fixing of value. Thus, market value, asset value, dividends, earning prospects, the nature of the enterprise and any other facts which were known

29

or which could be ascertained as of the date of the merger and which throw any light on future prospects of the merged corporation are not only pertinent to an inquiry as to the value of the dissenting stockholder's interest, but must be considered . . . .

*Tri-Cont'l Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950). The Delaware Supreme Court has adhered to this definition ever since.[5]

To determine the fair value of a stockholder's proportionate interest in the corporation, the court must "envisage the entire pre-merger company as a 'going concern,' as a standalone entity, and assess its value as such." *Dell*, 177 A.3d at 20. When doing so, the court must value the corporation based on its "operative reality" at the time of the merger. *Id.* "The underlying assumption in an appraisal valuation is that the dissenting shareholders would be willing to maintain their investment position had the merger not occurred." *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 298 (Del. 1996). Consequently, the trial court must assess "the value of the company . . . as a going concern, rather than its value to a third party as an acquisition."[6]

---

[5] *Stillwater*, 240 A.3d at 10 (explaining that a stockholder should be awarded "'his proportionate interest in [the] going concern'" (alteration in original) (quoting *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1, 21 (Del. 2017))); *Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 210 A.3d 128, 132–33 (Del. 2019) (per curiam) ("[f]air value is . . . the value of the company to the stockholder as a going concern," defined as the stockholder's "proportionate interest in a going concern" (internal quotation marks omitted)); *accord Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 222 (Del. 2005); *Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 553 (Del. 2000); *Rapid-Am. Corp. v. Harris*, 603 A.2d 796, 802 (Del. 1992); *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1144 (Del. 1989); *Bell v. Kirby Lumber Corp.*, 413 A.2d 137, 141 (Del. 1980).

[6] *M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 795 (Del. 1999); *accord Golden Telecom, Inc. v. Glob. GT LP*, 11 A.3d 214, 217 (Del. 2010) ("fair value" means "the value

## A.      The Dueling Burdens Of Proof

By providing that "the Court shall determine the fair value of the shares," the General Assembly placed the obligation to determine the fair value of the shares on the court. *Gonsalves v. Straight Arrow Publ'rs, Inc.*, 701 A.2d 357, 360–61 (Del. 1997). Because of this statutory mandate, the allocation of the burden of proof in an appraisal proceeding differs from traditional adversary litigation. In an appraisal proceeding, "both sides have the burden of proving their respective valuation positions by a preponderance of the evidence." *Fir Tree Value Master Fund, LP v. Jarden Corp.*, 236 A.3d 313, 322 (Del. 2020) (alterations and internal quotation marks omitted). "No presumption, favorable or unfavorable, attaches to either side's valuation . . . ." *Pinson v. Campbell-Taggart, Inc.*, 1989 WL 17438, at *6 (Del. Ch. Feb. 28, 1989). "Each party also bears the burden of proving the constituent elements of its valuation position . . . , including the propriety of a particular method, modification, discount, or premium." *In re Appraisal of Stillwater Mining Co.* (*Stillwater Trial*), 2019 WL 3943851, at *18 (Del. Ch. Aug. 21, 2019) (internal quotation marks omitted), *aff'd sub nom. Brigade Leveraged Cap. Structures Fund Ltd. v. Stillwater Mining Co.*, 240 A.3d 3 (Del. 2020).

---

to a stockholder of the firm as a going concern, as opposed to the firm's value in the context of an acquisition or other transaction"). *But see DFC Glob. Corp. v. Muirfield Value P'rs, L.P.*, 172 A.3d 346, 371 (describing fair value inquiry as evaluating whether stockholders "receive fair compensation for their shares in the sense that it reflects what they deserve to receive based on what would fairly be given to them in an arm's-length transaction").

A party may seek to prove fair value using "any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983). "In discharging its statutory mandate, the Court of Chancery has the discretion to select one of the parties' valuation models as its general framework or to fashion its own." *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 525–26 (Del. 1999). The Court of Chancery may "adopt any one expert's model, methodology, and mathematical calculations, *in toto*, if that valuation is supported by credible evidence and withstands a critical judicial analysis on the record." *Id.* at 526. Or the court may evaluate the valuation opinions submitted by the parties, select the most representative analysis, and then make appropriate adjustments to the resulting valuation. *Merion Cap. L.P. v. Lender Processing Servs., Inc.*, 2016 WL 7324170, at *16 (Del. Ch. Dec. 16, 2016). "If neither party satisfies its burden, however, the court must then use its own independent judgment to determine fair value." *Gholl v. eMachines, Inc.*, 2004 WL 2847865, at *5 (Del. Ch. Nov. 24, 2004).

Although the appraisal inquiry might seem to involve neutral principles of valuation, "corporate finance is not law." *In re Appraisal of Jarden Corp.* (*Jarden Trial*), 2019 WL 3244085, at *1 (Del. Ch. July 19, 2019), *aff'd sub nom. Fir Tree Value Master Fund, LP v. Jarden Corp.*, 236 A.3d 313, 322 (Del. 2020).

> The appraisal exercise is, at bottom, a fact finding exercise, and . . . by functional imperative, the evidence, including expert evidence, in one appraisal case will be different from the evidence presented in any other appraisal case. Different evidence, of course, can lead to different decision paths and different outcomes.

32

*Id.* In other words, an argument that succeeds in one case "may not prevail in another case if the proponents fail to generate a similarly persuasive level of probative evidence or if the opponents respond effectively." *Merion Cap.*, 2016 WL 7324170, at \*16. "What is necessary in any particular appraisal case is for the Court of Chancery to explain its fair value calculus in a manner that is grounded in the record before it." *Jarden*, 236 A.3d at 325 (alterations and internal quotation marks omitted); *accord Stillwater*, 240 A.3d at 16.

JLL advocated relying on the implied value of the merger consideration on the date of signing ($49.16 per share), adjusted to deduct an estimate of the net synergies included in the deal price ($4.87). JLL's expert, R. Glenn Hubbard, performed the requisite calculations and concluded that this methodology precluded any award of fair value award greater than $44.29 per share.

The petitioner presented two valuation methodologies. The petitioner's expert, Jaime d'Almeida, conducted a DCF analysis which provided a valuation indication on the closing date of $56.19 per share. He also prepared an adjusted trading price analysis that started with the Company's unaffected trading price before the announcement of the Merger, then adjusted the price to reflect changes attributable to the Company's unexpectedly good financial performance after the announcement of the Merger. The adjusted trading price methodology provided a valuation indication on the closing date of $58.68 per share. The petitioner argued for placing 90% weight on the DCF methodology and 10% weight on the adjusted trading price, resulting in a fair value determination of $56.44 per share.

**B.** **The Adjusted Deal Price**

JLL contends that the deal price at signing minus an estimate of the net synergies allocated to the seller provides the most reliable evidence of the fair value of the Company. The petitioner contends that the court should reject the deal price as a valuation indicator because the sale process lacked sufficient indicia of reliability.

The Delaware Supreme Court has endorsed using the deal price in an arm's-length transaction as an indicator of fair value.[7] While cautioning that a deal price that results from a reliable sale process often will provide the best evidence of fair value, the high court has maintained that "there is no presumption in favor of the deal price." *DFC*, 172 A.3d at 349. As the proponent of using the deal price, JLL bore the burden of proving its reliability.

**1.** **The Reliability Of The Sale Process**

The first step in using the deal price as a valuation indicator is to determine whether the sale process that led to the deal provided a sufficiently effective means of price discovery such that the court can regard the deal price as placing a ceiling on fair value. *See Aruba*, 210 A.3d at 142. A deal process that results from a sufficiently effective sale process likely establishes an upper bound for fair value because "it is widely assumed that

---

[7] *See, e.g., Aruba*, 210 A.3d at 135 & n.41 (describing the "long history of giving important weight to market-tested deal prices in the Court of Chancery and [the Delaware Supreme Court]"); *Dell*, 177 A.3d at 23 ("[T]he record as distilled by the trial court suggests that the deal price deserved heavy, if not dispositive, weight."); *DFC*; 172 A.3d at 349 ("[U]nder the conditions found by the Court of Chancery, economic principles suggest that the best evidence of fair value was the deal price . . . ."); *Gilbert*, 731 A.2d at 796 ("A merger price resulting from arms-length negotiations where there are no claims of collusion is a very strong indication of fair value.").

the sales price in many M & A deals includes a portion of the buyer's expected synergy gains, which is part of the premium the winning buyer must pay to prevail and obtain control." *DFC*, 172 A.3d at 371. The appraisal statue requires that that the court exclude any changes in value arising from the accomplishment or expectation of the merger from the fair value determination. 8 *Del. C.* § 262(h). Fair value thus must be determined "irrespective of the synergies involved in a merger." *Gilbert*, 731 A.2d at 797. Consequently, fair value under the appraisal statute typically will be less than a deal price that results from a sufficiently effective sale process.

When assessing the sufficiency of a transaction process, the Delaware Supreme Court has taken a flexible approach. The high court has stressed that the issue in an appraisal "is not whether a negotiator has extracted the highest possible bid." *Dell*, 177 A.3d at 33.

> Capitalism is rough and ready, and the purpose of an appraisal is not to make sure that the petitioners get the highest conceivable value that might have been procured had every domino fallen out of the company's way; rather, it is to make sure that they receive fair compensation for their shares in the sense that it reflects what they deserve to receive based on what would fairly be given to them in an arm's-length transaction.

*DFC*, 172 A.3d at 370–71. "[T]he key inquiry is whether the dissenters got fair value and were not exploited." *Dell*, 177 A.3d at 33.

When evaluating a transaction process under this standard, the Delaware Supreme Court has identified certain "objective indicia" which suggest that the process was sufficiently effective. *Stillwater*, 240 A.3d at 11–12. Following precedent, this decision

35

considers the extent to which the sale process exhibits those objective indicia.[8] Once

sufficient indicia are present, then the court "must determine whether they outweigh

weaknesses in the sale process, or whether those weaknesses undermine the persuasiveness

of the deal price." *Panera*, 2020 WL 506684, at *19. In this case, the petitioner's challenges

to the sale process effectively amount to challenges to the objective indicia. Rather than

conducting two separate analyses, this decision evaluates the indicia to determine whether

the sale process was sufficiently effective.

### a.    Affiliations With The Acquirer

The first objective indicator is whether the buyer was an unaffiliated third party.[9]

JLL was an unaffiliated acquirer with no prior ownership interest in the Company. This

factor is satisfied.

### b.    Conflicts Of Interest

The second objective indicator is whether the sell-side fiduciaries labored under

conflicts of interest.[10] In this case, the Company's senior managers faced conflicts that

---

[8] *See Regal*, 2021 WL 1916364, at *27–30; *Panera*, 2020 WL 506684, at *19–24; *Stillwater Trial*, 2019 WL 3943851, at *22–24; *Columbia Pipeline*, 2019 WL 3778370, at *24–26.

[9] *See DFC*, 172 A.2d at 349; *Regal*, 2021 WL 1916364, at *28; *Panera*, 2020 WL 506684, at *19; *Stillwater Trial*, 2019 WL 3943851, at *22; *Columbia Pipeline*, 2019 WL 3778370, at *25.

[10] *See Dell*, 177 A.3d at 28; *Regal*, 2021 WL 1916364, at *28–29; *Panera*, 2020 WL 506684, at *19; *Stillwater Trial*, 2019 WL 3943851, at *22; *Columbia Pipeline*, 2019 WL 3778370, at *25.

undermined the effectiveness of the sale process to some degree, but which are not sufficient to render the deal price unreliable as a valuation indicator.

The inquiry into conflicts begins at the board level. There is no dispute that six of the Board's nine members were disinterested, outside directors.[11] Those directors had the statutory authority under the Delaware General Corporation Law to approve or say "no" to any merger. *See* 8 *Del. C.* § 251(b). The three directors who faced varying degrees of conflict were Deborah McAneny, Gibson, and Thornton. McAneny was the lead outside director. Gibson and Thornton have already figured prominently in this decision. They were the Company's CEO and President, respectively, as well as the co-chairs of the Board.

Of the three, McAneny's interest in the Merger was the least likely to undermine the sale process. Her divergent interest resulted from the fact that in the Merger Agreement, the Company bargained for the right to appoint a member of the JLL Board, and the Board selected McAneny to be that director. When evaluating claims for breach of fiduciary duty, Delaware decisions generally discount the implications of board service with the surviving company.[12] Academic studies examining how directors behave indicate that losing or

---

[11] One of the ostensible nine directors is listed as "director emeritus." PTO ¶¶ 36–37. That title typically denotes an honorary position provided to a long-tenured and trusted individual who is no longer serving as an actual director but whose input remains valued. The parties have not engaged on this point, and they stipulated to the existence of a nine-member board. *Id.* This decision accepts that stipulation. Treating the director emeritus as an honorary director would not change the analysis. The court is not implicitly endorsing the treatment of an honorary director as a sitting director.

[12] *See, e.g.*, *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 45 (Del. Ch. 2013) (holding that director's post-merger "board membership [in post-merger entity], standing alone, would not be sufficient to create a disqualifying interest"); *Orman v. Cullman*, 794

gaining a board seat is likely material.[13] Assuming that to be true, then it would not affect

the court's assessment of the sale process in this case. McAneny was one of nine directors.

She did not have a direct role in the negotiations. She interacted with Gibson, Thornton,

---

A.2d 5, 28–29 (Del. Ch. 2002) ("The *only* fact alleged in support of Orman's allegation of director Barnet's interest is that he 'has an interest in the transaction since he will become a director of the surviving company.' No case has been cited to me, and I have found none, in which a director was found to have a financial interest *solely* because he will be a director in the surviving corporation. To the contrary, our case law has held that such an interest is not a disqualifying interest." (footnote omitted)); *Krim v. ProNet, Inc.*, 744 A.2d 523, 528 n.16 (Del. Ch. 1999) ("[T]he fact that several directors would retain board membership in the merged entity does not, standing alone, create a conflict of interest.").

[13] *See, e.g.*, Da Lin, *Beyond Beholden*, 44 J. Corp. L. 515, 525–26, 531–50 (2019) (presenting empirical research showing directors' behavior is sensitive to both fear of losing board seats and reward of obtaining additional board seats); Lucian Bebchuk & Jesse Fried, *Pay Without Performance: The Unfulfilled Promise of Executive Compensation* 25 (2004) (describing benefits of board service and concluding that "[i]n most cases, these benefits are likely to be economically significant to the director."); David I. Walker, *The Manager's Share*, 47 Wm. & Mary L. Rev. 587, 633 (2005) (arguing that from an economic perspective, "[t]he incentive to retain a board position generally outweighs the incentive to maximize shareholder value"); David Yermack, *Remuneration, Retention, and Reputation Incentives for Outside Directors*, 59 J. Fin. 2281, 2282, 2307 (2004) (finding "statistically significant evidence that outside directors receive positive performance incentives from compensation, turnover, and opportunities to obtain new board seats" that have a direct impact on the accumulation of wealth by that director and "considering that an outside director may serve on several boards, these incentives appear non-trivial, albeit much smaller than those offered to top managers"); Jarrad Harford, *Takeover Bids and Target Directors' Incentives*: *The Impact of a Bid on Directors' Wealth and Board Seats*, 69 J. Fin. Econ. 51, 68 (2003) (finding statistical evidence that a board seat is difficult to replace, because directors who lose a seat as a result of a takeover can expect to hold one fewer directorship than peers for two years following a completed merger; finding that directors suffer a net financial penalty from the loss of the directorship "between zero and -$65,443"); *see also* Renée B. Adams & Daniel Ferreira, *Do Directors Perform for Pay?*, 46 J. Acct. & Econ. 154, 168–69 (2008) (finding statistically significant correlation between director attendance and per meeting fees, indicating that per-meeting payments of approximately $1000 have a material influence on directors).

and the Company's advisors to a greater degree than the other non-management directors, but there is no indication that she skewed the deal process.[14]

Gibson and Thornton confronted disparate interests that warrant more careful scrutiny. As this court has observed, "the potential sale of a corporation has enormous implications for corporate managers . . . , and a range of human motivations" can undermine a manager's independence in a change of control transaction. *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 439 (Del. Ch. 2012).

> Greed is not the only human emotion that can pull one from the path of propriety; so might hatred, lust, envy, revenge, or, as is here alleged, shame or pride. Indeed any human emotion may cause a [fiduciary] to place his own interests, preferences or appetites before the welfare of the corporation.

*In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989).

Loyalty to an organization or institution can play a role:

> Many people commit a huge portion of their lives to a single large-scale business organization. They derive their identity in part from that organization and feel that they contribute to the identity of the firm. The mission of the firm is not seen by those involved with it as wholly economic, nor the continued existence of its distinctive identity as a matter of indifference.

*Paramount Commc'ns Inc. v. Time Inc.*, 1989 WL 79880, at *7 (Del. Ch. July 14, 1989), *aff'd sub nom. In re Time Inc. S'holder Litig.*, 565 A.2d 281 (Del. 1989) (TABLE). Put

---

[14] If there were other conflicts in the boardroom, such as relationships with management, the acquirer, or key advisors, then McAneny's incentives might add more color to the mix. Evaluating a group's ability to reach independent and disinterested decisions is necessarily a holistic process. An influence that warrants discounting in a comparatively pure setting can take on greater significance when operating in conjunction with other influences.

simply, "[*h*]*omo sapiens* is not merely *homo economicus*." *In re Oracle Corp. Deriv. Litig.*, 824 A.2d 917, 938 (Del. Ch. 2003).

The risk that a senior manager's personal interests will undermine a sale process increases when the process is "driven by management." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 194 (Del. Ch. 2007). Some bidders might want to retain existing management or offer to provide them with future incentives, while others might not. *See id.* Whether or not management is retained can affect the court's analysis of a sale process for purposes of appraisal. *See DFC*, 172 A.3d at 376 (crediting trial court's finding that "[t]he deal did not involve the potential conflicts of interest inherent in a management buyout or negotiations to retain existing management—indeed, Lone Star took the opposite approach, replacing most key executives" as supporting reliability of deal price (emphasis and internal quotation marks omitted)).

In this case, Gibson and Thornton had significant personal incentives that aligned imperfectly with the interests of the Company's stockholders. Together, they had built the Company as an entity, taken it public, and established an industry-leading capital markets franchise. They were justifiably proud of what they had accomplished. They wanted to preserve the business they had created and the culture they believed was essential to its success.

As a result, when deciding whether to engage with a potential buyer, Gibson and Thornton placed significant value on considerations other than the price the buyer could pay. They engaged with JLL because Ulbrich signaled in his initial call with Gibson that he was receptive to having Gibson and his team run the combined capital markets business

40

their way. Gibson and Thornton then prioritized and expended significant effort securing the non-price terms they wanted, including leadership positions at the combined entity for themselves and their colleagues. Gibson Tr. 33–34; JX 194 at '001; *accord* JX 191. Over the ensuing eight months leading to the signing of the Merger Agreement, Gibson consistently stressed that the governance issues were nonnegotiable. *See* Gibson Tr. 33; Ulbrich Tr. 588–89, 591–92; JX 191; JX 192 at '001–02; JX 1409 at '002.

Gibson and Thornton so prioritized governance issues that they did not address the deal price until the negotiations were far along. Ulbrich first contacted Gibson in July 2018. Early in the parties' discussions, Gibson intimated to JLL that he did "not think pricing will be an issue. JX 273 at 2. JLL believed that Gibson "wants this to happen" and valued "more structure than price." JX 271. Emboldened, JLL floated a price in the range of $45 to $46 per share, a price range that Metcalfe later referred to as "a major buzz kill if not more." JX 423 at '004. The parties did not revisit price until February 2019, after Gibson had spent significant time and negotiating capital on governance issues.

JLL cites four factors that it says mitigated any conflict. First, JLL points out that Gibson and Thornton were only two members of the Board. That is true, but they also were the Company's undisputed leaders and the Board's primary source of information about both the Company and the deal. Gibson and Thornton had the ability to shape the boardroom dynamic to an outsized degree.[15]

---

[15] The scholarly literature on this point is extensive. *See, e.g.*, Charles R. Korsmo, *Delaware's Retreat from Judicial Scrutiny of Mergers*, 70 U.C. Irvine L. Rev. 55, 98 (2019) ("To a very large extent, independent directors are forced to rely upon the

Next, JLL points out that the Board authorized Gibson to negotiate on its behalf with full knowledge that he had an interest in his employment with the post-merger entity. Gibson Tr. 51–52, 109. That is also true, but trust can be misplaced, and it is possible for an executive to misuse or abuse (consciously or unconsciously) the authority he has been given. If the record showed that Gibson and Thornton undermined the sale process, then the fact that the Board put them in that position would not eliminate the problem.

JLL also points out that other actors were involved in the sale process, such as Morgan Stanley, and that late in the sale process Ulbrich remarked in frustration that Gibson seemed no longer to be "in charge." Ulbrich Tr. 619–22; *accord* JX 1409 at '003 (Ulbrich expressing his belief that Gibson did not "have the key to [the] gate to go through the finish line"). That is likewise true, but Gibson took the lead on establishing the overall structure of the negotiations, which prioritized governance issues over price, and between July 2018 and January 2019, he succeeded in securing what he described as 90% of his demands on those fronts. JX 368 at 1. The fact that other actors played significant parts does not diminish Gibson and Thornton's roles in shaping the deal.

Finally, JLL argues that Gibson and Thornton did not face any form of conflict because they did not receive retention payments or other change-of-control benefits in the Merger. This decision has already explained that financial rewards are one possible source of conflict, but not the only one. Gibson and Thornton had built the Company, and they

---

information provided to them by the very managers they are meant to discipline." (collecting authorities)).

42

believed (perhaps accurately) that their leadership and the culture they had created were essential to its success.

Gibson and Thornton faced real conflicts, and the prudence of their approach to the negotiations was debatable. However, on this record, the conflicts that Gibson and Thornton faced and their approach to the negotiations do not warrant rejecting the deal price metric. As a real-estate focused investment bank, the value of the Company's business lay in its people. As a result, the Company's value to JLL depended on the combined firm retaining the Company's top producers. Those employees easily could have left if they perceived that a deal would lead to changes in how the business was operated. Changes to the senior management team, the managerial structure, or the compensation system would lead to an exodus.

Ulbrich testified credibly that JLL's top priority was "to buy . . . the right to convince all those important brokers and fee earners that they will find a place which is equally or even better for them to do their business." Ulbrich Tr. 591. To obtain the benefits of the Merger, JLL needed to retain the Company's key managers and producers. By securing those arrangements first, Gibson and Thornton ensured that JLL had confidence in what it was getting. They therefore set themselves up to bargain for a better price.

On the facts of this case, Gibson and Thornton's conflicts did not undermine the effectiveness of the sale process. The second indication of a reliable sale process is present.

### c. Access To Information

A third objective indicator that the Delaware Supreme Court has cited is the existence of "robust public information" about the value of the company. *DFC*, 172 A.3d

43

at 349. Decisions have found this indicator to be present when a company makes the filings required by the federal securities laws. *Id.*; *Regal*, 2021 WL 1916364, at \*29; *see Panera*, 2020 WL 506684, at \*20.

For a deal involving a public target, this factor almost always will be met. In this case, the Company went public in 2007. For the twelve years preceding the Merger, it made the filings required by the federal securities laws. This factor is satisfied.

### d.     Bidder Due Diligence

A fourth objective indicator is whether the bidder conducted diligence to obtain non-public information about the company's value. *See Regal*, 2021 WL 1916364, at \*29; *Panera*, 2020 WL 506684, at \*20; *Stillwater Trial*, 2019 WL 3943851, at \*23; *Columbia Pipeline*, 2019 WL 3778370, at \*25. The Delaware Supreme Court has stated that a buyer who possesses "material nonpublic information about the seller is in a strong position (and is uniquely incentivized) to properly value the seller." *Aruba*, 210 A.3d at 137. Under the Delaware Supreme Court's framework, this factor is satisfied if the buyer has "signed a confidentiality agreement, done exclusive due diligence, [and] gotten access to material nonpublic information." *Id.* at 140.

JLL did those things. Indeed, through the initial months of discussions about governance issues and culture, JLL obtained a detailed office-by-office breakdown of the Company's personnel. *See* JX 264; JX 287. In December 2018, the Company provided additional confidential information about the Company's corporate structure, financial performance, operations, and employee compensation. The Company provided additional highly sensitive information about the Company's top producers in February 2019, after

44

the parties had reached agreement on price. Morgan Stanley expressed concern about the extent of the disclosures, noting that "providing this information is HIGHLY unusual if not unprecedented." JX 829. Another member of Metcalfe's team described the disclosures as a "[r]oadmap for poaching." *Id.* JLL thus obtained significant non-public information about the Company.

### e. Negotiations Over The Merger Price

A fifth objective indicator is whether the parties engaged in negotiations over the price.[16] Price negotiations took place, but the record surrounding those negotiations gave rise to litigable issues regarding their effectiveness.

As noted previously, the Company's negotiators deferred discussing price until the they had addressed their non-monetary priorities. JLL's first serious overture to the Company took place in July 2018. For the next four months, the parties engaged in detailed negotiations over governance and personnel issues. No one engaged in meaningful negotiations over price. When the topic of price first surfaced on October 25, 2018, Gibson indicated that he did not think the deal price would be an issue and that his management team was "ready to run at this hard." JX 273 at 2. JLL understood that Gibson wanted the deal to happen and was concerned primarily with the non-monetary terms. JX 271.

---

[16] *See Aruba*, 210 A.3d at 139; *Dell*, 177 A.3d at 28; *Regal*, 2021 WL 1916364, at *29; *Panera*, 2020 WL 506684, at *20; *Stillwater Trial*, 2019 WL 3943851, at *23; *Columbia Pipeline*, 2019 WL 3778370, at *25.

Ulbrich first mentioned a dollar figure on November 7, 2018. He floated a range of $45 to $46, reflecting a premium of 12–14% over the Company's trading price. Gibson declined to engage on price, stating that "neither party had sufficient information to determine appropriate valuations at that point in time and further work on governance . . . should occur before further discussions on price." JX 1258 at '118.

After that, Gibson continued to negotiate with JLL over his non-monetary priorities. The subject of price only came up again in January 2019, after the parties had agreed on the rough terms of the retention arrangements for the Company's key producers. At that point, to counter any impression that the Company had effectively accepted JLL's price range, the Board instructed Morgan Stanley to convey to JLL that any subsequent offer would have to provide total value of $47 or more, net of transaction expenses and incentive arrangements. PTO ¶ 115.

The actual pricing negotiations took place during an eleven-day period between February 7 and February 17, 2019. During those eleven days, Morgan Stanley and the Company's executives repeatedly expressed concern that they did not have sufficient information to negotiate effectively. The problem lay in the fact that 50% of the deal consideration would be in JLL stock, and the Company had not conducted reverse due diligence on JLL so that it could value JLL's equity and assess the potential synergies.

The following table shows the flow of the pricing discussions during this period.

| Date | Event | Consideration Per Share Cash + JLL Stock Ratio ≈ Implied Price |
|------|-------|----------------------------------------------------------------|
| 2/7/2019 | J.P. Morgan sends term sheet to Morgan Stanley. | $23 + 0.159x ≈ **$46** |

46

| 2/11/2019 | HFF Board authorizes Morgan Stanley to counter with a cash/stock mix resulting in $48 per share, but says to wait until after JLL's earnings announcement. | $48 |
|---|---|---|
| 2/12/2019 | After JLL's earnings announcement, JLL's stock price increases to $166.15. | JLL's 2/7/2019 offer has increased to >$49. |
| 2/13/2019 | Morgan Stanley provides two options. | Option A: $24 + 0.159x ≈ $50.02<br>Option B: $24.76 + 0.1513x ≈ $49.52 |
| 2/15/2019 | JLL Board approves three counteroffers. J.P. Morgan conveys Option B1. | Option A: $23.33 + 0.159x ≈ $50.02<br>Option B1: $24.51 + 0.1498x ≈ $49.02<br>Option B2: $24.63 + 0.1505x ≈ $49.25 |
| 2/16/2019 | Ulbrich offers Option B2. Gibson accepts later that day. | $24.63 + 0.1505x ≈ $49.46 |
| 2/17/2019 | Morgan Stanley sends a revised term sheet accepting the price. | $24.63 + 0.1505x ≈ $49.46 |

After JLL opened at $46 per share, the parties ended up agreeing to implied consideration of $49.46 per share. The Company thus bargained for an increase of 7.5% over the upper end of JLL's initial range of $45 to $46 per share.

It seems possible that different negotiators who placed more emphasis on price might have obtained a better result. By delaying discussions over price and focusing on governance and employee compensation, the Company necessarily gave up some bargaining leverage. During these discussions, no one from the Company signaled that price *also* would be an important issue. To the contrary, Gibson indicated that he did not expect price to be a significant issue, and his actions conveyed that the management team wanted to get the deal done. Gibson's failure to push back or suggest a higher range when Ulbrich socialized $45–$46 per share anchored the subsequent discussions.

The Company also could have helped itself by insisting on reverse due diligence from JLL as soon as JLL indicated in November that the deal consideration would be half

stock. The Company likewise could have helped itself by insisting on reverse due diligence to construct its own synergy estimates and use them to push back on JLL's conservative figures. The Company did not obtain the information that would have enabled its negotiators to bargain more effectively, likely because Gibson and Thornton were focused on governance and compensation issues.

Nevertheless, the Company did obtain price increases from JLL. Moreover, an internal analysis prepared by J.P. Morgan showed that JLL valued the Company at $46.80 on a standalone basis. JX 1054 at 5. By agreeing to consideration with an implied value of $49.16 on the date of signing, JLL thought it was paying a price that allocated a share of the synergies to the Company. As noted, the Delaware Supreme Court has stated that a buyer who possesses "material nonpublic information about the seller is in a strong position (and is uniquely incentivized) to properly value the seller." *Aruba*, 210 A.3d at 137.

Whether other negotiators might have obtained a higher price by bargaining differently is not the issue in an appraisal proceeding.[17] For purposes of evaluating whether the sale price was effective, the court looks to whether the negotiators bargained at arm's length and whether the seller obtained price increases. That happened here.

---

[17] *See Jarden*, 236 A.3d at 322 ("[T]he trial judge must determine fair value, and 'fair value is just that, "fair." It does not mean the highest possible price that a company might have sold for.'" (footnote omitted) (quoting *DFC*, 172 A.3d at 370)); *Dell*, 177 A.3d at 33 ("The issue in an appraisal is not whether a negotiator has extracted the highest possible bid. Rather, the key inquiry is whether the dissenters got fair value and were not exploited."); *DFC*, 172 A.3d at 370 (noting that "the purpose of an appraisal is not to make sure that the petitioners get the highest conceivable value that might have been procured had every domino fallen out of the company's way").

### f. The Post-Signing Phase

A sixth objective indicator is whether the transaction agreement was sufficiently open to permit bidders to emerge during the post-signing phase such that the absence of competing bidders can be regarded as validating the price. *See Regal*, 2021 WL 1916364, at *29; *Panera*, 2020 WL 506684, at *21–24; *Columbia Pipeline*, 2019 WL 3778370, at *25. The Delaware Supreme Court has explained that when potential competing bidders have "an open chance . . . to bid," then the absence of a topping bid indicates that "buyers do not believe the asset on sale is sufficiently valuable for them to engage in a bidding contest against each other."[18]

The Merger Agreement included a no-shop provision with a superior-proposal out, a five-day unlimited matching right for JLL that reset upon any increase from a competing bidder, information rights entitling JLL to receive all information provided to a competing bidder, and a bifurcated termination fee that increased from 1.4% to 2.8% of the Company's equity value after forty-five days. The petitioner argues that because the Company did not engage in any pre-signing outreach and only negotiated with JLL, the

---

[18] *Aruba*, 210 A.3d at 136, *accord Dell*, 177 A.3d at 29 ("Fair value entails at minimum a price some buyer is willing to pay—not a price at which no class of buyers in the market would pay."); *id.* at 33 (finding that absence of higher bid meant "that the deal market was already robust and that a topping bid involved a serious risk of overpayment," which "suggests the price is already at a level that is fair"); *DFC*, 172 A.3d at 375–76 (citing "the failure of other buyers to pursue the company when they had a free chance to do so" as factor supporting fairness of merger price).

Merger Agreement needed to provide for a more open post-signing phase for the sale process to be effective.

Delaware decisions have upheld single-bidder processes as sufficiently effective to make the deal price a reliable indicator of fair value.[19] The question is whether the merger agreement allowed for a sufficiently open post-signing market check. A company does not have to engage in post-signing outreach; a passive market check can be sufficient. Here, the Merger Agreement's suite of deal protections resembled the packages in other cases in which Delaware courts have held that a single-bidder process followed by the absence of a topping bidder during a passive post-signing market check resulted in a deal price that provided reliable evidence of fair value.[20]

To distinguish this case, the petitioner contends that in addition to the provisions in the Merger Agreement "[t]he retention agreements signed between JLL and the HFF employees further solidified JLL's bid." Dkt. 132 at 40. The petitioner argues that any

---

[19] *See Regal*, 2021 WL 1916364, at *30–32; *Stillwater Trial*, 2019 WL 3943851, at *24–30; *Columbia Pipeline*, 2019 WL 3778370, at *25; *LongPath Cap., LLC v. Ramtron Int'l Corp.*, 2015 WL 4540443, at *21 (Del. Ch. June 30, 2015); *see also Blueblade Cap. Opportunities LLC v. Norcraft Cos., Inc.*, 2018 WL 3602940, at *24 & n.265 (Del. Ch. July 27, 2018) (finding "no basis in law or fact" for proposition that a single bidder process followed by a go-shop "will *never* produce fair value for the target" (citation omitted)).

[20] *See Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 2018 WL 922139, at *21, *38 (Del. Ch. Feb. 15, 2018) (no-shop, fiduciary out, matching rights, 3% termination fee), *rev'd*, *Aruba*, 210 A.3d 128; *Panera*, 2020 WL 506684, at *21 (no-shop, fiduciary out, matching rights, 3% termination fee); *Columbia Pipeline*, 2019 WL 3778370, at *20–26, *40 (no-shop, fiduciary out, matching rights, 3% termination fee plus 0.42% expense reimbursement fee).

bidder had to consider that the Company's management team and top producers seemed happy with JLL and could defect to JLL rather than working for a new buyer. The petitioner maintains that to secure the Company's management team and key producers, a competing bidder likely would have to pay more. The petitioner observes that the problem could have been solved by having the Company enter into the retention agreements so that any bidder would benefit from them. *Id.*

JLL responds that the retention and employment agreements would terminate if the Merger Agreement terminated, freeing the employees to sign with a new bidder. *See* JX 1123 at '002. That feature avoids having the agreements operate as a *de facto* crown-jewel asset lock-up. It did not avoid the problem that JLL had made itself an attractive home for the Company's management team and employees and offered what Metcalfe regarded as a "payout" to the Company's key producers. JX 501 at '002; *see* Metcalfe Tr. 371. Any competing bidder would have to overcome that.

The problem for the petitioner lies in the economics. To a buyer, the retention agreements were "nothing else than an increase of purchase price." Ulbrich Dep. 152–53; *see* Gibson Tr. 18–19; Metcalfe Tr. 371–72; McAneny Tr. 418–19. They thus functioned to increase the amount that a topping bidder would have to pay. But the magnitude of the increased payment would not have been preclusive or coercive. A 10% increase in the retention payments would represent only a 0.6% increase in the merger consideration. Even if the bidder paid the higher, second tier termination fee, the combined expense would be 3.4% of equity value. That amount is lower than the combined termination fee and expense

51

reimbursement payment in *Columbia Pipeline*, which this court held "did not undermine the sale process for appraisal purposes." 2019 WL 3778370, at *40.

The petitioner argues that the Company should have engaged in pre-signing outreach. Because the Merger Agreement allowed for a sufficiently open albeit passive market check, the absence of pre-signing outreach does not undermine the effectiveness of the sale process. *See Stillwater Trial*, 2019 WL 3943851, at *30. What matters is that the Company did not do anything during the pre-signing phase that would have dissuaded other bidders from participating in the post-signing phase. The petitioner also contends that the Company failed to respond to inquiries from Colliers and CBRE. Gibson did respond, although he did not convey any urgency about the engagement. Neither potential acquirer followed up. Either could have participated during the post-signing phase. It is theoretically possible that greater pre-signing outreach might have resulted in a higher deal price, but that is not the test in an appraisal. There is no reason to believe that the Company's sale process was so ineffective as to result in a price below standalone value.

### g. The Sale Process Was Reliable.

The Company proved by a preponderance of the evidence that the sale process was sufficiently effective. The sale process was not perfect, and the petitioner highlighted its flaws. But when the record is viewed as a whole, the sale process passes muster. The deal price therefore operates as ceiling on the fair value of the Company at the time of signing.

## 2. Adjustments For Value Arising From The Accomplishment Or Expectation Of The Merger

The second step in using the adjusted deal price metric is to determine what adjustments are necessary to exclude sources of value (positive or negative) arising from the accomplishment or expectation of the merger. *See* 8 *Del. C.* § 262(h). That generally means excluding an estimate of the amount of synergies that were included in the deal price. Individual components of the synergy analysis can be additive or subtractive (*i.e.*, dis-synergies). The aggregate amount of synergies is generally positive, causing the adjusted deal price to be lower than the headline price.

In this case, the parties also debated how to treat the retention payments that JLL agreed to make to the Company's senior managers and sales professionals. The petitioner argues that those payments represent consideration that otherwise would have gone to the stockholders and hence should be added to the deal price. JLL contends that the payments were a cost that the acquirer had to incur to close the transaction and generate the net synergies it shared with the Company. The retention payments are smaller than the net synergies, so the answer will not raise the fair value award above the deal price. The difference lies in the magnitude of the downward adjustment. Under the petitioner's approach, the court would add 100% of the value of the retention payments to the adjusted deal price. Under JLL's approach, the payments are factored into the calculation of net synergies, and then a percentage of that amount is allocated to the Company and deducted from the deal price. JLL's approach functionally results in a fraction of the value of the retention payments being added to the deal price.

53

### a. The Synergy Adjustment

When deriving an adjustment for synergies, the court engages in two tasks. In the first step, the court assesses the categories of value that the parties contend arise from the accomplishment or expectation of the merger. In the second step, the court estimates the extent to which those sources of value were incorporated in the deal price.

Hubbard opined that the deal price incorporated a net synergy value of $4.87 per share. *See* Hubbard Report ¶¶ 8, 138–46. As the proponent of its synergy deduction, JLL bore the burden of proving its proposed adjustment. *Regal*, 2021 WL 1916364, at *43.

### i. Identifying The Available Synergies

For a category of synergies to be excluded under the appraisal statute, it must "aris[e] from the accomplishment or expectation of the merger." 8 *Del. C.* § 262(h). This valuation principle "rul[es] out consideration of not just the gains that the particular merger will produce, but also the gains that might be produced from any other merger." *Aruba*, 210 A.3d at 133. When quantifying the value of synergies, the relevant consideration is the buyer's estimation of their value. "If a buyer overpays for a company based on the buyer's subjective yet unrealistic synergy expectations, then the deal price nevertheless reflects those synergy expectations." *Regal*, 2021 WL 1916364, at *35.

JLL proved that it reliably estimated synergies of $60 million. During a meeting of the JLL Board on November 12, 2018, Koster presented a preliminary analysis that anticipated much greater synergies. *See* JX 367 at '052. The JLL Board was skeptical and instructed Koster to create a more detailed analysis. The JLL Board stressed that the synergies estimate "would be critical to the underlying economic analysis" of the deal.

54

Koster Tr. 482. Ulbrich instructed Koster to quantify the synergies that could be "deemed certain." *Id.* at 515; *see* Ulbrich Tr. 604–05; JX 646 at '026.

Koster took his task seriously. He assembled a team of 125 to 150 JLL employees that looked deeply at cost synergies. Koster Tr. 508. They also had "extensive discussion[s]" with the Company's management. *Id.* at 477–78; *see id.* at 508–09. The team also accounted for dis-synergies, such as the expense associated with moving JLL's producers to the Company's compensation platform. The team included as a dis-synergy certain retention payments JLL intended to make to its own producers to induce them to remain at the combined entity. *See id.* at 505–06; JX 646 at '026.

Koster presented the revised synergies analysis to the JLL Board on February 7, 2019. The revised analysis was both more detailed and more conservative. Koster and his team estimated synergies with a total EBITDA impact of $74 million annually. JX 646 at '026. Of that total, Koster and his team regarded $60 million as meeting the Ulbrich's "deemed certain" test. Koster Tr. 515. The JLL Board felt comfortable with Koster's revised analysis. Ulbrich Tr. 614–16.

Koster's synergy analysis was divided into the following categories:

- Cost Synergies
  - Personnel
    - Local Capital Markets / Sector Leadership
    - Compensation System Impact
    - Retention Cost (JLL only)
    - Production Support

55

- ▪ Servicing & Underwriting

- ▪ Corporate Functions

    - ▪ Marketing

    - ▪ Research

    - ▪ Finance / Accounting

    - ▪ Technology

    - ▪ Human Resources

- ▪ Office Consolidation

- ▪ Public Costs

- • Revenue Synergies

    - ▪ Fannie Mae

    - ▪ Capital Markets Best Practice Revenue

    - ▪ Property Management

    - ▪ Agency Leasing

    - ▪ Valuations

JX 646 at '026.

Each category of synergies only could be achieved as a result of the Merger. Each therefore must be excluded from the adjustment to the deal price. Some of the synergies have positive value, resulting in a deduction from the deal price. Others have negative value, resulting in an addition to the deal price.

Two items warrant more detailed discussion. First, Koster's synergy analysis included a category titled "Public Costs." That item reflected the $4.5 million in annual cost savings JLL anticipated realizing by eliminating "the discrete costs of HFF operating

56

as a standalone public company," including the compensation and benefits for the Company's directors, the payments for its independent auditor costs, and other public company costs that the Company no longer would incur as a subsidiary of JLL. Koster Tr. 511. Precedent diverges on whether eliminating public company costs constitutes value arising from the accomplishment or expectation of the merger, with one decision indicating that the costs should not be excluded because any going-private transaction would generate them.[21] Section 262(h) does not contemplate comparing the transaction-specific attributes of value with the results of other transactions. It contemplates comparing the transaction-specific attributes of value with the Company's operative reality as a stand-alone entity. In its pre-Merger operative reality as a publicly traded entity, the Company could not achieve those savings. The net savings therefore arose from the accomplishment or expectation of the Merger and must be excluded from the fair value determination.

---

[21] *Compare Merion Cap. LP v. BMC Software, Inc.*, 2015 WL 6164771, at *17 (Del. Ch. Oct. 21, 2015) ("If I assume that inherent in a public company is value, achievable via tax savings or otherwise, that can be realized by an acquirer—any acquirer—taking the company private, such a savings is logically a component of the intrinsic value owned by the stockholder that exists regardless of the merger. Therefore, to the extent some portion of that value flows to the sellers, it is not value 'arising from . . . the merger,' . . . ."), *with Huff Fund Inv. P'ship v. CKx, Inc.*, 2014 WL 2042797, at *3 (Del. Ch. May 19, 2014) (declining to exclude public-to-private savings "[w]ithout reaching the theoretical question of under what circumstances cost-savings may constitute synergies excludable from going-concern value under Section 262(h)" because "the record here contains insufficient evidence to support a finding that Apollo formed its $5.50 bid based on cost-savings that, had the Company continued as a going concern, CKx management could not have itself realized"), *and BMC*, 2015 WL 6164771, at *17 (acknowledging that public-to-private savings are "likely properly excluded from the going-concern value, which our case law has explained is part of the definition of fair value as I must apply it here").

Second, the "Personnel" category included a subcategory for "Compensation System Impact." That item reflected the negative value created for JLL by applying the Company's compensation structure to its own producers. Koster Tr. 505. The "Personnel" category also included a subcategory for "Retention Cost ([JLL] only)." JX 646 at '026. That item reflected the negative value created when JLL made retention payments to its own producers. Koster Tr. 505.

The synergy items in the "Personnel" category are technically not sources of value associated with the Company. Both are payments that JLL made as a result of the Merger. When calculating the adjusted deal price, however, Hubbard included these expenses. In doing so, he treated them as costs that JLL had to incur to achieve the synergies that the transaction generated. Their inclusion benefits the petitioner by lowering the potential synergy deduction.

JLL proved that it anticipated net synergies in the amount of a $60 million increase to the combined entity's annual EBITDA beginning in 2021 and extending into the indefinite future.

### ii. Incorporating The Company-Side Retention Payments

The principal dispute regarding the adjustment for sources of value arising from the Merger involves how to handle the retention payments that Gibson extracted for his management team and key producers. JLL did not include those amounts as a dis-synergy in its synergy calculations. Hubbard did, and he also included other transaction costs as additional dis-synergies. The petitioner argues that the retention payments reflect a source

58

of value that should be added to the deal price, not a dis-synergy to incorporated in the net synergy adjustment and allocated between the buyer and seller.

The argument for treating the retention payments as a dis-synergy views them as a cost of the transaction, like the investment banker's fee, counsel's fees, filing fees, and other out-of-pocket costs. If JLL wanted to achieve the benefits of the synergies that it shared with the Company in the deal price, then JLL had to incur those costs. The total available synergies were therefore net of those outlays. This court has used the adjusted merger price to determine fair value based on analyses in which the synergy adjustment was reduced for transaction costs.[22] The same logic applies to the retention payments.

The argument for treating the retention payments as a source of value that must be added back to the Company's standalone value starts from the premise that in the

---

[22] *See Jarden Trial*, 2019 WL 3244085, at *26; *Ramtron*, 2015 WL 45430443, at *26. In another decision, the court refused to make any adjustment to the deal price for the quite significant transaction costs associated with a leveraged buy-out, which amounted to $450 million or $6.51 per share. *Solera*, 2018 WL 362566, at *27–28. The court viewed the potential upward adjustment to the transaction price as violating the Delaware Supreme Court's instruction in *DFC* that an appraisal proceeding should only ensure that stockholders receive "'what would fairly be given to them in an arm's-length transaction.'" *Id.* at *28 (emphasis omitted) (quoting *DFC*, 172 A.2d at 370–71). In an arm's-length transaction, the deal price meets that standard by definition, and the court did not want to depart from it. The court relied on a policy concern that if the adjusted deal price incorporated value for transaction costs, then it would create an incentive for "rational shareholders, in even the most pristine deal processes to seek appraisal to capture their share of the transaction costs (plus interest)." *Id.* That concern only would exist if the magnitude of the transaction costs exceeded the available synergies, as it did in the *Solera* case. In that setting, however, it seems likely that transaction costs could have a downward effect on the deal price and hence depress the fair value determination. Consequently, the net synergies calculation used in *Jarden* and *Ramtron* is more persuasive.

59

Company's operative reality as a stand-alone entity, the Company had no need for retention payments and was not planning to make any. To the extent that the adjusted deal price methodology seeks to generate a value for the Company as a standalone entity, then that value should not include the retention payments. In the real-world dynamic of the deal negotiations, however, Gibson bargained for and obtained the retention payments before the parties negotiated price. If Gibson had not obtained the retention payments, then JLL could have used the $112 million that went to the key producers to increase the deal price. Ulbrich testified that the cost of the retention payments was "nothing else than an increase of [the] purchase price." Ulbrich Dep. 152–53. Other record evidence indicates that JLL reduced the deal price to account for the retention payments. *See* Koster Tr. 484–86; JX 509 at '010; JX 1258 at '123.

On this record, treating the retention payments as a dis-synergy is the more persuasive methodology. JLL treated the retention payments for its own employees as a dis-synergy, and it makes sense to treat the payments for the Company's employees in similar fashion. JLL's approach also recognizes that the retention payments were a cost that JLL had to pay to achieve the net synergies in the deal, which warrants treating the retention payments like other transaction costs.

### iii. Valuing The Net Synergies

To create an estimate of the per-share value of the net synergies, Hubbard used a DCF model. He started with JLL's internal synergy projections for the second half of 2019 through 2021, then applied the growth rate implied by those years to project modest increases through 2024, which he used as his terminal year. Hubbard included up-front

costs of $66 million for transaction expenses, $112 million for the retention payments to the Company's employees, and $50 million for the retention payments to JLL's employees. To grow cash flows during the terminal period, Hubbard used a perpetuity growth rate of 3%. To derive a present value of the cash flows, Hubbard used a discount rate of 11.16%. Using these inputs, Hubbard calculated that the net synergies had a present value of $371.2 million. JX 1475, "Exhibit 5A" tab, Cell F30.

The petitioner contended that Hubbard's synergies DCF failed to account for the recognized fact that revenue synergies are harder to realize than cost synergies. The petitioner argued Hubbard should have either used different discount rates for the different synergies or probability-weighted his estimate.

The petitioner's argument has conceptual appeal, and in a different case it might prevail. On the current record, the evidence demonstrates that JLL carefully documented its synergies and limited its estimates to amounts that could be deemed certain. Because of JLL's conservative planning, it was not necessary to value the categories of synergies differently. This decision therefore adopts Hubbard's estimate of synergies.

### iv. Allocating The Net Synergies

After determining an amount of net synergies, the court's task is to estimate the quantum of synergies that were included in the deal price. In the *Regal* decision, this court surveyed the development of Delaware law regarding the sharing of synergies. *See* 2021 WL 1916364, at *42–49. The court discerned the following principles. First, Delaware law has not recognized a presumption that the seller captures synergies. Instead, the court must

make a fair value determination "that is grounded in the record before it."[23] Consequently, to obtain a synergy deduction, the respondent "bears the burden of demonstrating what, if any, portion of [the synergies] value was included in the price-per-share." *Jarden Trial*, 2019 WL 3244085, at \*26 (alteration in original) (internal quotation marks omitted). Second, if there is evidence that synergies were shared, then the court must make an estimate using its best judgment, despite the difficulties involved. *Regal*, 2021 WL 1916364, at \*48–49. Third, when making an adjustment, the court can rely on expert opinions and on studies providing generic estimates. *Id.* at \*49, 51–52.

JLL proved that that the Company's stockholders received a share of the synergies in the Merger. Ulbrich testified that JLL's final offer meant that JLL was "giving part of [the] synergies away . . . so that it was an attractive deal for their shareholders but still accretive to our shareholders." Ulbrich Tr. 618–19. Although JLL delayed providing any information about synergies to the Company until the last minute, that does not mean that deal price did not include a share of them. Likewise, although the Company and its financial advisor were less than vigorous in pursuing information about synergies, Morgan Stanley's estimates turned out to be fairly accurate. *See* JX 1310 at '027.

A contemporaneous analysis by J.P. Morgan estimated the percentage of synergies that the Company captured through the deal price. At the implied price at signing of $49.01

---

[23] *Jarden*, 236 A.3d at 325 (internal quotation marks omitted); *see also Panera*, 2020 WL 506684, at \*18 ("Because the Court determines fair value based on an adversarial presentation blending facts, opinions, and argument, the Court's conclusions in one appraisal proceeding may not squarely inform its conclusions in another.").

per share, J.P. Morgan estimated total synergies of $494 million and estimated that the Company had captured $271 million, or 54.9%. JX 1054 at 5. J.P. Morgan's approach to synergies differed somewhat from the approach taken in this case, but the estimate provides an indication of the division.

Hubbard estimated the allocation of synergies by relying on a study by the Boston Consulting Group. *See* Jens Kengelbach et al., *The 2018 M&A Report: Synergies Take Center Stage* (2018) (the "BCG Study"). The BCG Study found that "since 2007, the shareholders of target companies have captured, on average, 54% of the value of synergies, thanks to share price increases near the announcement date." *Id.* at 18 (using "average" to refer to median in sample); *accord id.* Ex. 12. In three cases, this court has accepted expert opinions that allocated synergies based on the BCG Study or a predecessor version of the report. *See Regal*, 2021 WL 1916364, at *52; *Panera*, 2020 WL 506684, at *38; *Solera*, 2018 WL 3625644, at *29 & n.364.

Precedent supports the use of Hubbard's methodology. In addition, his estimate of a 54% synergy allocation aligns closely with J.P. Morgan's estimate.

To determine the amount of net synergies included in the deal price, Hubbard multiplied the value of the net synergies ($371.2 million) by the percentage allocated to the Company (54%), resulting in an estimate of that the deal consideration included $200.4 million in synergies. Dividing that number by the Company's 41.165 million outstanding shares results in a deduction for net synergies of $4.87 per share. JX 1475, "Exhibit 5A" tab, Cell F32.

63

## 3.  The Finding Regarding Fair Value As Of Signing

This decision has held that the sale process generated a deal price that can serve as a reliable indicator of the fair value of the Company as of signing. Based on JLL's stock price of $163.02 per share on the date of signing, the consideration provided under the Merger Agreement had an implied value of $49.16 per share. JLL proved for purposes of this appraisal proceeding that the deal consideration included $4.87 per share of synergies. Deducting that amount from the deal price results in a valuation indication for the Company of $44.29 per share as of the date of signing.

That valuation indication finds support in the Company's trading price during the period leading up to the announcement of the Merger Agreement on March 19, 2019. During the thirty-day window leading up to February 21, 2019, the Company's stock traded around $41 to $42 per share. On February 22, 2019, the Company's stock traded up by 7.31% to close at $45.50 per share. It then remained at those levels, trading at an average price of $45.32 between February 22 and the announcement of the Merger Agreement on March 19, 2019. After the announcement, the Company's stock closed at $49.01, up 5.38% from the previous day's close. JLL argued that the run-up in the stock price suggested that the unaffected stock price of $46.51 per share on March 16, 2019, contained some takeover speculation, constituting value arising from the expectation of the Merger. The adjusted deal price of $44.29 per share is thus below what the parties have regarded as the unaffected market price of $46.51 per share, consistent with the suggestion that the unaffected market price was not wholly unaffected.

### 4. Fair Value As Of Closing

In an appraisal proceeding, the court must determine the fair value of the company on the date the merger closes. *Stillwater*, 240 A.3d at 17. The valuation date is "not the date the merger agreement is executed." *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1135 (Del. 2020). "Thus, if the value of the corporation changes between the signing of the merger agreement and the closing, then the fair value determination must be measured by the 'operative reality' of the corporation at the time of the merger." *Stillwater*, 240 A.3d at 17. "[T]he party seeking an adjustment to the deal price reflecting a valuation change between signing and closing bears the burden to identify that change and prove the amount to be adjusted." *Id.*

In this case, the value of the merger consideration declined substantially signing and closing, falling from an implied value of $49.16 per share at the time of signing to $45.87 per share at the time of closing. At that point, the implied value of the consideration was 1.38% below the closing price of the Company's stock on the day before the announcement of the Merger.

The drop in the value of the merger consideration resulted from a decline in JLL's stock price. When the parties reached an agreement on price on Sunday, February 17, 2019, JLL's stock had closed at $164.96 per share on the previous Friday. By March 19, 2019, when the parties announced the executed Merger Agreement, JLL's stock price had declined to $163.02 per share. By the date of closing, JLL's stock price had declined further to $141.13 per share. The 13.9% decline in JLL's stock price cause the value of the merger consideration to fall by 6.7%.

65

Because of the reasons for the decline in the value of the merger consideration, no one argues for using its value on the date of closing as a reliable valuation indication. JLL starts with the value on the date of signing, then adjusts the price for sources of value arising from the Merger. The petitioner asks the court to disregard the deal price.

This decision has determined that the adjusted deal price provides a persuasive indication of fair value at the time of signing. The operative question is whether and how to adjust the deal price to reflect any changes in value between signing and closing.

On April 24, 2019, after signing and before closing, the Company reported results for the first quarter of 2019 that dramatically exceeded analyst expectations (the "Earnings Beat"). The Company announced year-over-year increases in revenue of 20.9%, in EBTIA of 80.6%, and in net income of 62.9%. The Company's results beat the analyst consensus for earnings per share by 68%. At least one analyst speculated that the Earnings Beat might "change the underlying assumptions" for pricing the deal. *See* JX 1183 at '001. The Company's operative reality continued to improve in the second quarter of 2019, when the Company again outperformed its internal projections and analysts' forecasts. Conley Tr. 158–60; *see* JX 1380. The Company's revenue grew 12.7% year-over-year, resulting in the Company generating year-over-year revenue growth of 16.5% for the first half of 2019. JX 1388 at '007.

Theory, experience, and common sense dictate that when a company's performance departs from market expectations, then the value of the company changes. If the new information is positive, then the value of the company increases. If the new information is negative, then the value of the company decreases. *See* Charles R. Korsmo, *Information*

*Bundling, Disclosure Timing, and Judicial Deference to Market Valuations*, 62 B.C. L. Rev. 571, 611 (2021).

These truisms hold for the Company. In the two years leading up to the announcement of the Merger, the Company's stock price increased following earnings beats and decreased following earnings misses in all but one quarter. The only quarter that saw a disconnect between the Company's earnings results and subsequent stock price movement was the third quarter of 2017, when the Company's stock price declined by 0.2% following an earnings beat of exactly one cent. d'Almeida Report ¶ 44, Fig. 6.

In the abstract, changes in a company's stock price can be used to measure a change in value. "Reliance on the trading price of a widely held stock is generally accepted in the financial community, and the trading price or metrics derived from it are regularly used to estimate the value of a publicly held firm based on its operative reality in that configuration." *Stillwater Trial*, 2019 WL 3943851, at \*51. Recent Delaware Supreme Court decisions have endorsed the use of trading prices as a valuation indicator. *See Dell*, 177 A.3d at 35–38; *DFC*, 172 A.3d at 369–70 & n.118. Although the Delaware Supreme Court reversed a decision that relied exclusively on the unaffected trading price, *see Aruba*, 210 A.3d at 139–40, the high court subsequently rejected the notion that "a corporation's unaffected stock price cannot equate to fair value." *Jarden*, 236 A.3d at 316. The high court confirmed the "traditional Delaware view that in some cases the price a stock trades at in an efficient market is an important indicator of its economic value and should be given weight." *Id.* at 325 (internal quotation marks omitted).

Whether the trading price should be used as a valuation indicator turns on whether the market exhibits sufficient evidence of informational efficiency. That concept describes how rapidly security prices reflect or impound new information that arrives to the market. *See* Alex Frino et al., *Introduction to Corporate Finance* 305 (5th ed. 2013). Parties in prior cases have argued about the distinction between informational efficiency and fundamental value efficiency. To derive a reliable indication for the change in the Company's value, the market for the Company's stock need only be informationally efficient.

No one disputes that before the Merger, the Company's stock traded in an informationally efficient market. Hubbard analyzed the issue and found evidence that the market for the Company's stock was informationally efficient. Hubbard Report ¶¶ 51–52. The parties' recognition of that fact makes sense, as the attributes of the Company's stock satisfied the factors the Delaware Supreme Court has used as evidence of informational efficiency. *See Dell*, 177 A.3d at 25–28; *DFC*, 172 A.3d at 369–70. Based on the record, this decision finds the Company's common stock historically traded in a market that was informationally efficient in the semi-strong sense.

The question then becomes how to use stock market prices to evaluate the magnitude of the change in the Company's value between signing and closing. The announcement of the Merger Agreement tied the Company's stock price to the likelihood of the transaction closing for the agreed-upon consideration. That reality in turn means that the reaction of the Company's stock price to the Earnings Beat cannot be used to measure the change in the Company's value between signing and closing.

Instead, d'Almeida constructed a model that used an index to generate an implied price for the Company's stock. He ran a regression of the abnormal change in the Company's stock price against the percentage by which the Company's earnings per share beat or missed the consensus of the analysts who covered the Company in 2017 and 2018 (the "Earnings Surprise Regression"). The Earnings Surprise Regression produced a formula that approximated the reaction of the Company's stock price to the magnitude of the earnings beat or miss.

d'Almeida estimated the abnormal change in the company's stock price by conducting an event study that compared the change in the market price of the Company's stock to the S&P 500 index and the Dow Jones U.S. Real Estate Index (the "Market Performance Study"). The S&P 500 represented the broader market, and the Dow Jones U.S. Real Estate Index (the "Real Estate Index") represented the real estate industry. The Market Performance Study also produced a formula that approximated the reaction of the Company's stock price to the movements in the S&P 500 and the Real Estate Index.

In the Earnings Surprise Regression, d'Almeida found "a statistically significant relationship between the earnings surprise and the abnormal return." d'Almeida Report ¶ 46. The Earnings Surprise Regression generated an r-squared of 0.70, suggesting that 70% of the abnormal change in the stock price was explained by the magnitude of the earnings surprise. *Id.* d'Almeida provided a scatter plot that shows a rough correlation between earnings surprise and stock price movement, and he explained that the statistically significant changes in the Company's stock price were not temporary. d'Almeida Tr. 747. The other days when the Company's stock price exhibited statistically significant changes

69

corresponded with dividend announcements and other market-moving events such as speeches by the Company's executives at industry events. *Id.*

To generate an implied stock price on the date of closing, d'Almeida started with the Company's unaffected stock price of $46.51, using the closing price on the day before the announcement of the Merger Agreement. He then adjusted the Company's stock price to reflect the performance of the indices. His model indicated that the Company's stock price would have traded at $48.43 before the Earnings Beat, reflecting an increase of $1.92, an increase of 4.1%. After the Earnings Beat, the Company's stock price would have increased by $10.25 to $58.68, an incremental increase of 21.2%. d'Almeida Report ¶ 47.

JLL responds that "[t]he mere fact of favorable quarterly results between signing and closing is not sufficient evidence that 'these short-term improvements were indicative of a long-term trend' to justify an adjustment to the deal price." Dkt. 134 at 62 (quoting *In re PetSmart, Inc.*, 2017 WL 2303599, at *31 (Del. Ch. May 26, 2017)). As *PetSmart* demonstrates, a company's outperformance in one quarter, standing alone, need not serve as sufficient evidence that the transaction price is "stale by the time of closing." *Id.*

An appraisal case involves fact-finding, and the record in one case may support a price adjustment when the record in another may not. Here, the Company's outperformance was both more significant and durable. *Cf. id.* at *19 (considering a moderate earnings beat in which revenue increased by 6% and earnings per share guidance by 11.7%). In *PetSmart*, the management team believed the improved results were temporary, and the company's subsequent performance validated that expectation. *See id.* at *31. Here, the Company's management believed that its business would outperform both internal and external

70

expectations, and the Company's excellent performance continued. *See* Conley Tr. 219–22; JX 412 at 2; JX 1295, "Summary Pipeline" tab; d'Almeida Report ¶¶ 44, 60, Fig. 6.

In a recent case, Hubbard constructed a similar model of a but-for trading price to assert that investors suffered no damages. The court rejected the methodology in that case because Hubbard started from an unreliable market price and did not take into account the existence of material non-public information. The court did not reject the methodology. *See Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP,* 2021 WL 5267734, at *83-84 (Del. Ch. Nov. 12, 2021).

For purposes of this case, Hubbard replicated d'Almeida's analysis using a significantly larger data sample. His more detailed analysis implied that the Earnings Beat would have resulted in an increase of 6.0% ($2.91 per share) over the trended price of $48.43. Hubbard also criticized d'Almeida's use of the Real Estate Index because most of its components are real estate investment trusts ("REITs") that are not comparable to the Company. Hubbard instead used his own index of peer companies. Using Hubbard's index reduced the change in the trended price by $0.40 per share, resulting in an increase over the trended price of $2.51 or 5.2%. *See* Hubbard Rebuttal Report Ex. 2.

This decision adopts Hubbard's version of d'Almeida's analysis and uses it to estimate the percentage change in the value of the Company between signing and closing. To do so, rather than starting with the unaffected market price of $46.51, this decision starts with the adjusted deal price at signing of $44.29. This decision does not update the adjusted deal price for trends in the market indices between signing and closing. This decision only adds the 5.2% that Hubbard's version indicates is a fair representation of the change in the

71

Company's value resulting from the improved performance reflected in the Earnings Beat. This approach implies that the fair value of the Company rose by $2.30 at the time of the Earnings Beat, resulting in a value of $46.59 per share.

This approach is concededly imperfect. For one thing, it only provides an indication of the change in the Company's value as of the Earnings Beat on April 24, 2019. The Merger closed on July 1, 2019. Using the Company's value as of the Earnings Beat gets closer to the closing date, but does not reflect a value as of the closing date. It is nevertheless a closer measure than the adjusted deal price at signing. It is also likely to be conservative, as the Company's operating performance continued to improve during 2019. The method is not perfect, but the perfect should not be the enemy of the good.

The court's approach also includes an element of mixing and matching. To derive the indication of fair value at the time of signing, the court is using the adjusted deal price. To derive a measure of the post-signing change in fair value between signing and closing, the court is using metrics derived from trading prices.

As JLL recognizes, in an ideal world, all valuation indicators converge. In the mathematical perfection of finance theory, the stock market price equals the discounted present value of the Company's future cash flows which equals the negotiated value that arm's-length bargainers would place on the entity exclusive of synergies. Because these values are theoretically equivalent, they should change in lockstep. An observable change in one can be used to update another.

In the real world, and particularly in the messy domain of litigation, valuation outputs diverge. The court must do the best it can to determine fair value as of closing. The

72

statute places that mandate on the court. *Gonsalves*, 701 A.2d at 361. If neither side presents a persuasive valuation, then the court must come up with its own, even if that means conducting an analysis of its own and reaching a result that neither side sought.[24]

There is strong corroborative evidence that $46.59 is a persuasive estimate of the value of the Company's stock at closing. In a presentation to the JLL Board, J.P. Morgan opined that the stand-alone equity value of the Company was $46.80 per share. JX 1054 at 5. As this decision has twice-noted, the Delaware Supreme Court has stated that "a buyer in possession of material nonpublic information about the seller is in a strong position (and is uniquely incentivized) to properly value the seller." *Aruba*, 210 A.3d at 137. Describing an acquirer's superior insight into the value of the target, the high court posited that "HP's access to nonpublic information . . . improved [its] ability to estimate Aruba's going-concern value over that of the market as a whole. In particular, HP had better insight into

---

[24] *See, e.g.*, *Dell*, 177 A.3d at 21 (trial court must "undertake an '*independent*' assessment of fair value" (quoting *Golden Telecom*, 11 A.3d at 217–18 ("Section 262(h) unambiguously calls upon the Court of Chancery to perform an *independent* evaluation of 'fair value' at the time of a transaction.")); *DFC*, 162 A.3d at 364 (same); *Dobler*, 880 A.2d at 222 (in the absence of "reliable evidence, either pre-merger or during the trial, to enable the Court of Chancery to perform its mandated task, the Court may rely upon its expertise and upon whatever evidence is presented to determine the fair value independently"); *Le Beau*, 737 A.2d at 525–26 ("In discharging its statutory mandate, the Court of Chancery has discretion to select one of the parties' valuation models as its general framework or to fashion its own."); *Gonsalves*, 701 A.3d at 361–62 (explaining that "consideration of alternative earnings bases, other than the two choices advanced by the experts, was clearly within the court's discretion"); *but see Aruba*, 210 A.3d at 139 (holding that trial court "injected fairness and due process problems" into an appraisal proceeding by reaching determination of fair value based on unaffected market price, which had emerged as an issue after *Dell* and *DFC*).

Aruba's future prospects than the market because it was aware that Aruba expected its quarterly results to exceed analysts' expectations." *Id.* at 139 (footnote omitted). "These observations suggest that a buyer's internal valuations carry an extra imprimatur of reliability and are likely to provide more persuasive evidence of value than the buyer's actual bids, which are tempered by the buyer's desire to acquire the target for the lowest possible price." *Regal*, 2021 WL 1916364, at \*20. JLL's internal valuation estimate of the Company's standalone value, reached with the benefit of inside information about the Company's future prospects, aligns with and corroborates the implied value that the market would have afforded the Company after the Earnings Beat.

### 5. The Finding Regarding The Adjusted Deal Price Metric

The adjusted deal price provides a reliable indicator of the fair value of the Company at signing. An additional adjustment to account for the positive developments in the Company's business after signing generates a reliable indicator of fair value as of closing. After those adjustments, the adjusted deal price metric provides a fair value indication at the time of closing of $46.59 per share.

## C. The DCF Methodology

The petitioner contends that the court should rely on a DCF model that d'Almeida prepared. Hubbard also prepared a DCF model, but JLL did not rely on it as a valuation indicator. Instead, Hubbard critiqued d'Almeida's model. As the proponent of valuing the Company using this method, the petitioner bore the burden of proving the reliability of the DCF-based valuation.

74

The DCF method is a technique that is generally accepted in the financial community. It is a "standard" method that "gives life to the finance principle that firms should be valued based on the expected value of their future cash flows, discounted to present value in a manner that accounts for risk." *Andaloro v. PFPC Worldwide, Inc.*, 2005 WL 2045640, at *9 (Del. Ch. Aug. 19, 2005).

> The DCF model entails three basic components: an estimation of net cash flows that the firm will generate and when, over some period; a terminal or residual value equal to the future value, as of the end of the projection period, of the firm's cash flows beyond the projection period; and finally a cost of capital with which to discount to a present value both the projected net cash flows and the estimated terminal or residual value.

*In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 490 (Del. Ch. 1991) (internal quotation marks omitted).

The DCF method thus involves numerous assumptions about the future performance of the subject company. Those assumptions "may always be challenged in any particular case." *Pinson*, 1989 WL 17438, at *8 n.11. The petitioner bore the burden of proving that d'Almeida's assumptions were reasonable such that his DCF model provided reliable evidence of the value of the Company as of the closing of the Merger.

The petitioner failed to prove that d'Almeida's DCF model provided a sufficiently reliable indicator of the fair value to adopt in the face of market evidence. If the court lacked a reliable source of market evidence, then the court would make adjustments to the DCF model. With the adjusted deal price metric available, that is unnecessary.

As a threshold matter, d'Almeida's DCF model suffers because of a lack of reliable management projections. The Company did not prepare multi-year projections. The Company only prepared a one-year budget. d'Almeida therefore had to create projections.

d'Almeida created his projections by starting with the Company's adjusted EBITDA forecast for the second half of 2019. At the time of the Merger, the Company had exceeded its adjusted EBITDA forecast for the first half of 2019 to such a degree that if the Company performed as expected for the second half of the year, then it would exceed its full-year budget by 10%. In his projections, d'Almeida made the conservative assumption that the Company's full-year EBITDA would beat the budget by 9.1%.

To extend his projections through a discrete forecast period that ended in 2023, d'Almeida created a linear extrapolation of the Company's revenue growth since 2006, resulting in revenue growth of 6.5%. He adopted the assumption that adjusted EBITDA margin would remain constant at the level projected in the Company's 2019 budget. d'Almeida then tax effected the Company's cash flows by computing an effective tax rate for the Company of 24.7%.

The next step in projecting the company's cash flows involves subtracting the increase in the company's net working capital, defined as current assets minus current liabilities. *See* Richard A. Brealey et al., *Principles of Corporate Finance* 771 (13th ed. 2020). As a professional services firm, the Company lacks conventional current assets such as inventory, and it historically maintained a negative working capital balance equal to -9.5% of revenue. d'Almeida projected that net working capital would remain constant as a percentage of revenue throughout his discrete projection period.

76

d'Almeida then added back depreciation and amortization expense and subtracted capital expenditures. As a final adjustment to his cash flow projections, d'Almeida subtracted the income the Company generated from mortgage servicing rights, which is a non-cash item.

By following these steps, d'Almeida created a credible set of projections, but they were his own projections, and they were developed for purposes of litigation. "When evaluating the suitability of projections, Delaware cases express a strong preference for management projections prepared in the ordinary course of business and available as of the date of the merger." *Regal*, 2021 WL 1916364, at *21 (collecting cases).

> By corollary, projections prepared outside of the ordinary course do not enjoy the same deference. In fact, management projections can be, and have been, rejected entirely when they lack sufficient indicia of reliability, such as when they were prepared: (1) outside of the ordinary course of business; (2) by a management team that never before had created long-term projections; (3) by a management team with a motive to alter the projections, such as to protect their jobs; and (4) when the possibility of litigation, including an appraisal action, was likely and probably affected the neutrality of the projections.

*Ramtron*, 2015 WL 4540443, at *10.

d'Almeida followed a careful process, made reasonable assumptions, and produced a credible set of projections. In a different case and on a different record, the court might well rely on a DCF analysis based on his projections. In this case, there is no reason to take that step.

Once the analysis moves beyond the projections, d'Almeida generated a DCF analysis that used middle-of-the-fairway assumptions.

77

- He used a perpetuity growth rate of 3.3%, based on the midpoint of projected inflation and projected nominal GDP.

- He adjusted the Company's depreciation and amortization during the terminal period to be less than capital expenditures and income from mortgage servicing rights in the terminal period. He also adjusted the annual change in net working capital to be $0 in the terminal year, because the Company would not operate with negative working capital into perpetuity.[25]

- He used the interest rate on the twenty-year U.S. Treasury Bond as of June 30, 2019, the day before the closing of the Merger, to calculate the risk free rate. That approach is standard practice for valuation professionals.

- He reviewed various betas and selected a reasonable figure. Third party sources indicate that his beta calculation was appropriate, if not conservative.[26]

---

[25] *See* Aswath Damodaran, *Damodaran on Valuation: Security Analysis for Investment and Corporate Finance* 197–98 (2006) ("[T]here is no reason why firms cannot continue to use supplier credit as a source of capital in the short term. In the long term, however, we should not assume that noncash working capital can become more and more negative over time. At some point in the future, we have to assume either that the change in noncash working capital is zero or that pressure will build for increases in working capital (and negative cash flows). Put in blunter terms, we can assume cash inflows from changes in working capital are reasonable in the near term but not in perpetuity (terminal value).").

[26] At trial, Hubbard challenged d'Almeida's beta, testifying that it was "completely not okay" for d'Almeida to select a beta by taking into account standard errors. Hubbard Tr. 1006. He claimed he knew of "no theory – and that's capital N, capital O – that says you select betas looking for standard errors." *Id.* Contrary to Hubbard's testimony, Damodaran has written on the importance of standard error for beta. Damodaran, *supra*, at 95, 102. So have Pratt and Grabowski. *See* Pratt & Grabowski, *supra*, at 205. A Duff & Phelps handbook also addresses it. *See* JX 485 at '073. Hubbard cited the latter two works for other points. *See* Hubbard Report ¶ 174 n.471, ¶ 186. Damodaran explains that the slope of the regression used to compute beta, "like any statistical estimate, comes with a standard error, which reveals just how noisy the estimate is, and can be used to arrive at confidence intervals for the 'true' beta value." Damodaran, *supra*, at 95. Damodaran thus recommends various strategies for selecting betas that minimize the standard error of the estimate. *Id.* at 102. Duff & Phelps comments that "the greater the sample of beta estimates drawn from guideline public companies of similar size as the subject business you use as the basis for the beta estimate of the subject business[,] generally the better the accuracy because the

- To estimate the equity risk premium, d'Almeida used a supply-side equity risk premium of 6.14%. This court has endorsed the use of the supply-side equity risk premium. *Glob. GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 514–18 (Del. Ch. 2010), *aff'd*, 11 A.3d 214 (Del. 2010); *accord Orchard*, 2012 WL 2923305, at *3.

- d'Almeida applied a size premium that had the effect of increasing the Company's cost of equity, reducing the present value of the cash flows, and producing a lower valuation estimate.[27] JLL did not dispute d'Almeida's use of a size premium.

Hubbard offered critiques of d'Almeida's DCF model, and some of them would have been sufficiently meritorious to warrant adjustments. But for the projections, the cumulative weight of the meritorious critiques would not have undermined the reliability of d'Almeida's model as an indication of fair value.

JLL also advanced an overarching criticism that is worth addressing. JLL sought to portray the Company as relatively less valuable and to undermine d'Almeida's projections by contending that the Company's industry was cyclical. According to JLL, there was a broad consensus at the Company and in the industry that the economy was "long in the cycle around 2019," making it likely that an economic downturn in intermediate future would negatively impact the Company. Dkt. 134 at 67.

To support the argument that 2019 was late in the cycle, JLL relied on self-serving testimony by witnesses from the Company and JLL. *See, e.g.*, Conley Tr. 141–42;

---

standard error of [the] estimate is reduced." JX 485 at '074. Like many inputs to a DCF model, d'Almeida's choice of beta was debatable. But it is not the case that d'Almeida's selection was unsupported by finance theory.

[27] The inclusion of a size premium changes the conventional CAPM equation for a company's cost of equity from $K_e = R_f + (B * R_m)$, to $K_e = R_f + (B * R_m) + \text{Size Premium}$.

McAneny Tr. 470–71; Ulbrich Tr. 585. JLL also relied on Eric Sussman, an expert on the real estate industry. *See* Sussman Report App'x D.

There was admittedly considerable speculation in 2018 and 2019 that the economic expansion that began after the global financial crisis in 2008 would come to an end in the intermediate future. On the other hand, there were also good reasons to think the expansion would continue for the intermediate future. The first reason is purely epistemic: It is difficult to make accurate predictions. The petitioner's real estate industry expert, Steven Laposa, has written that "the majority of econometric forecast models developed by government, non-government organizations, and private economic forecasters did not predict the timing or cyclical lows of GDP growth rates of the Great Recession, nor anticipate the severity of the Great Recession or the elongated recovery." JX 106 at '007.

Each side's industry expert compiled statements by commentators, analysts, and executives to support their competing interpretations. Sussman Report App'x D; Laposa Report Ex. 10. The sources overlapped considerably, with the same sources providing material for both sides. What the sources show is that the future of the global economy and real estate industry was uncertain.

There is also countervailing evidence that is case-specific. In a presentation at the meeting of the JLL Board on November 21, 2018, J.P. Morgan highlighted the strong growth in the real estate capital markets business following the brief downturn in 2016 and 2017, opining that capital "[a]llocations by institutional and private investors into real estate" were "increasing almost universally." JX 367 at '049. At a meeting of the Board on December 11, 2018, the Company's management emphasized the same point, highlighting

the "increasing allocations by institutional investors . . . , and higher velocity of transaction volumes through increased institutional ownership" of real estate assets. JX 412 at '003. In a sufficiently severe economic downturn, those capital flows would dry up. In a less severe one, the rotation of institutional investment dollars into real estate could sustain revenue growth for the Company at levels comparable to those it enjoyed during the boom years leading up to the Merger. Further contradicting the testimony of the Company's witnesses, a management presentation stated that "the overall U.S. commercial real estate market fundamentals remain strong and attractive to investors on a broad level." *Id.*

The fact that JLL bought the Company is another piece of countervailing evidence. Ulbrich's testimony about the economy being late in the cycle stands in tension with the fact that he championed and JLL consummated a multibillion dollar investment to acquire the Company at a premium to its current trading price.

The perplexities and failures of macroeconomic forecasting have inspired thoughtful treatment by thinkers outside of the realm of corporate law.[28] In an appraisal, it

---

[28] *See* Nassim Nicolas Taleb, *The Black Swan* 150 (2d ed. 2010) ("A few researchers have examined the work and attitude of security analysts, with amazing results, particularly when one considers the epistemic arrogance of these operators. In a study comparing them with weather forecasters, Tadeusz Tyska and Piotr Ziolonka document that the analysts are somehow worse at predicting, while having a greater faith in their own skills. . . . [T]hese brokerage-house analysts predicted *nothing*—a naïve forecast made by someone who takes the figures from one period as predictors of the next would not do markedly worse. Yet analysts are informed about companies' orders, forthcoming contracts, and planned expenditures, so this advanced knowledge should help them do considerably better than a naïve forecaster looking at the past data without further information. Worse yet, the forecasters' errors were significantly larger than the average difference between individual forecasts, which indicates herding."); *id.* at 151 (summarizing research showing that in a sample of approximately seventy-five economists, "experts' error rates were . . . many

is not clear how to resolve these issues. In this case, there is ample countervailing evidence about the future of the real estate industry and the Company's prospects.

If market-based metrics were lacking, then an adjusted version of d'Almeida's DCF model could provide reliable evidence of the fair value of the Company. Because market-market-based metrics are available, this decision does not consider it.

## D.    The Implied Market Price

The petitioner also relied on d'Almeida's adjusted market price study to argue that the Company's value as of the closing date was $58.68 per share. d'Almeida only proposed giving 10% weight to this methodology.

d'Almeida's adjusted market price offers some insight into the potential value of the Company, but it is not sufficiently reliable to use as a valuation indicator. This decision instead has adopted Hubbard's more conservative version of d'Almeida's methodology to estimate the change in the Company's value after signing as a result of the Earnings Beat. Although imperfect, that approach starts with the reliable valuation indicator of the

-----

times what they had estimated," and the "only regularity [the researcher] found was the negative effect of reputation on prediction: those who had a big reputation were worse predictors than those who had none"); *id.* at 160–62 (elaborating on forecasting errors). *See generally* Alexander Rosenberg, *If Economics Isn't Science, What Is It?*, 14 Philosophical Forum 296, 301–03 (1983) ("[E]conomics' predictive weakness hinges on the intentional typology of the phenomena it explains and the causes it identifies. Its failure to uncover laws of human behavior is deprived of improving explanatory and predictive power because its assumptions can't be improved in a way that transmits improved precision to their consequences. . . . Much of the mystery surrounding the actual development of economic theory . . . can be comprehended and properly appreciated if we give up the notion that economics any longer has the aims or makes the claims of an empirical science of human behavior.").

adjusted deal price and modifies that indicator to make it a more accurate measure of the Company's fair value at closing.

The court will not otherwise use d'Almeida's methodology. As discussed previously, d'Almeida's methodology starts from an unaffected trading price of $46.51 per share on March 16, 2019, but that unaffected trading price was likely affected to some degree by takeover speculation. The adjusted deal price metric is a more reliable indication of the Company's value as of signing. If the court used Hubbard's modifications to d'Almeida's method to bring the unaffected trading price forward to the date of the Earnings Beat, then the result would be a valuation indication of $48.92 ($46.51 * (1 + 5.2%)). Because of the higher initial starting point, that output is marginally higher than the result generated by bringing the deal price forward, but it would be less reliable because of the starting point.

## III. CONCLUSION

The fair value of the Company at closing was $46.59 per share. In reaching this determination, the court has given the deal price "heavy, if not dispositive, weight." *Dell*, 177 A.3d at 23. The court has then deducted its best estimate of shared net synergies to generate an estimate of the fair value of the Company at signing. The court has then used its judgment to make a post-signing adjustment to the deal price metric to reflect the Company's value at closing. That adjustment is based on market-based indicators. The result represents a compromise between the opinions of the experts in this case, with the outcome hewing more closely to JLL's position.

83

Having sought appraisal for 1,983,000 shares, the petitioner is awarded $92,387,970. The petitioner will receive pre- and post-judgment interest on that amount at the legal rate, compounded monthly, from the closing of the Merger until the date of payment, and with the legal rate of interest changing in response to changes in the underlying reference rate.

Within thirty days, the parties shall submit a final order that has been agreed upon as to form. If there are issues that must be resolved before a final order can be entered, the parties instead will submit a joint letter identifying those issues and proposing a schedule for resolving them.